Dorsey A. SANDERS, III, Petitioner,

v.

Michael W. MOORE, et al., Respondents.

No. 5:97CV118OC–10GRJ.

United States District Court, M.D. Florida, Ocala Division.

Aug. 14, 2001.

James D. Middleton, Middleton & Prugh, P.A., Melrose, FL, for Petitioner.

Bonnie Jean Parrish, Office of the Attorney General, Department of Legal Affairs, Daytona Beach, FL, for Respondents.

### MEMORANDUM OPINION GRANTING WRIT OF HABEAS CORPUS UNDER 28 USC § 2254

HODGES, District Judge.

This is a habeas corpus proceeding brought by a state prisoner, through counsel, under 28 USC § 2254. The Petitioner is serving consecutive sentences of life imprisonment for murder and has now been incarcerated for over ten years.

The case presents a set of circumstances, both factually and legally, that can only be described as bizarre.

After hearing the oral arguments of counsel, and after study of their briefs and the record as a whole, I have decided that two of the Petitioner's interrelated constitutional claims have merit. He was denied his right of confrontation under the Sixth Amendment. The writ should issue commanding that he be retried or released.

### Background And Procedural History

On Friday, August 3, 1990, John Barrett entered the home of JoAnn Sanders in Floral City, Citrus County, Florida, and brutally murdered four men. The victims were Jerry Clark, the fiancee of JoAnn Sanders, who lived with her in the home; Roger Wilson, a carpenter who was renovating the home; Larry Johnson, the owner of a neighboring business; and Robert Hemingway, an employee of Mr. Johnson. Roger Wilson was shot in the head; the other three victims were beaten to death and their throats were cut.

After investigation, four people were indicted and charged with those murders

and other associated offenses. The indictees were: Dr. Dorsey Sanders, Jr., a veterinarian and the former husband of JoAnn Sanders; their son, Dorsey Sanders, III (the Petitioner in this case); Scott Burnside, who was Dr. Sanders' step-son-in-law;[1] and John Barrett, the actual perpetrator.

The State's theory of the prosecution was that Dr. Dorsey Sanders, Jr., and JoAnn Sanders had been involved since 1985 in a bitter dissolution of marriage proceeding; that in the summer of 1990, Dr. Sanders was anticipating the imminent entry of an adverse judgment in favor of JoAnn Sanders that could effectively undo his efforts to shield from judgment a sizable ranch near Melrose in Putnam County; that Dr. Sanders conspired with Dorsey Sanders, III, the Petitioner, and with Scott Burnside, to solicit John Barrett to murder JoAnn Sanders as a means of thwarting the anticipated judgment; that Barrett, acting as an instrument of that conspiracy, went to JoAnn Sanders' home on August 3, 1990, for the purpose of killing her; that JoAnn Sanders and the four victims were in the home together when Barrett arrived but JoAnn Sanders left before Barrett accomplished his mission; and, later in the

day, Barrett murdered the four remaining occupants.

Each of the four indictees was tried separately. The first to be tried was the Petitioner, Dorsey Sanders, III, then thirty-three years old. His trial began on July 22, 1991. He was found guilty by the jury on July 26, 1991.[2] The death penalty had been sought, but the jury recommended sentences of life imprisonment (verdict returned on July 27, 1991), and consecutive life sentences were imposed on August 19, 1991.[3]

The next to be tried was John Barrett. His trial began on July 29, 1991, immediately after the verdict was returned in Petitioner's trial. Barrett was also convicted and the trial judge imposed a sentence of death, overriding the jury's recommendation of life imprisonment. However, the conviction and sentence were reversed on appeal (*see Barrett v. State*, 649 So.2d 219 (Fla.1994)). Barrett was subsequently retried, convicted, and sentenced to life imprisonment.[4]

The next to be tried was Scott Burnside who had become a fugitive at the time of the indictment in 1991. He was apprehended, tried and convicted in 1993, but his conviction was also reversed on appeal

**1.** After divorcing JoAnn Sanders, Dr. Sanders married Barbara Hogan whose daughter Tonya was married to Scott Burnside.

**2.** The Petitioner's indictment was framed in seven counts. Count One charged solicitation of murder. Count Two charged conspiracy to murder. Count Three charged first degree murder of Roger Wilson. Count Four charged first degree murder of Jerry Clark. Count Five charged first degree murder of Robert Hemingway. Count Six charged first degree murder of Larry Johnson. Count Seven charged aiding and abetting or accessory after the fact. The jury found Petitioner not guilty of solicitation (Count One), but convicted him of each of the remaining counts.

**3.** The Petitioner was sentenced to four life sentences on the murder counts, each consec-

utive to the other, and to a lesser concurrent sentence on the conspiracy count. The record is unclear about the accessory count but, presumably, it was deemed to be merged within the murder convictions. *See Staten v. State*, 519 So.2d 622 (Fla.1988) (defendant's convictions as principal precluded additional convictions as accessory after the fact to the same crimes.) The imposition of consecutive sentences on the murder convictions effectively means that the Petitioner must serve 100 years before becoming eligible for parole consideration. *See State v. Boatwright*, 559 So.2d 210 (Fla.1990).

**4.** *See* the Florida Department of Corrections website at *www.dc.state.fl.US*, Inmate Population Information regarding John Barrett.

(*see Burnside v. State*, 656 So.2d 241 (Fla. 5th DCA 1995)). He was then retried, convicted, and was sentenced to life imprisonment.[5]

In the meantime, Dr. Dorsey Sanders, Jr., was tried and acquitted by his jury with the result that the alleged originator of the plot goes free, the intended victim is alive and well, and their son, convicted of conspiring to murder his mother, is serving consecutive sentences of life imprisonment for the killing by John Barrett of four innocent bystanders. And that is not the only bizarre aspect of the case. The Petitioner's direct appeal focused upon, among other issues, the admission against him of an incriminating statement made by Barrett to a friend in Ohio where Barrett had fled immediately after the murders. The Petitioner's appeal was denied and his conviction and sentence were affirmed by the Florida appellate court without opinion. *Sanders v. State*, 613 So.2d 64 (Fla. 5th DCA 1993), *cert. denied*, 509 U.S. 924, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993). But when the same issue based on admission of the same evidence was subsequently raised in Burnside's direct appeal, the same appellate court found error and reversed. Yet, still later, when the Petitioner attempted to raise this issue of inconsistent adjudications through a petition for habeas corpus filed with the state appellate court, his claim was denied without explanation or opinion; and, when he then asserted the issue in his post conviction proceedings under Florida Rule of Criminal Procedure 3.850, the claim was denied on the basis that the issue had already been decided in the habeas proceeding, a procedural bar which the appellate court

enforced based upon an unexplained finding of no "manifest injustice" (*see Sanders v. State*, 689 So.2d 410, 412 (Fla. 5th DCA 1997)), despite an earlier observation by the state trial judge that there *was* a manifest injustice![6]

### Exhaustion, Timeliness And The Need For An Evidentiary Hearing

In his direct appeal, and/or in his post conviction proceedings under Florida Rule of Criminal Procedure 3.850, the Petitioner exhausted his state court remedies, within the meaning of 28 USC § 2254, as to each of his present claims. The state concedes this (Doc. 7 at 9–10). The state does suggest that the Petition is untimely, but this contention has no merit. The Petition (Doc. 1) was filed on April 14, 1997, within the one year grace period following enactment of the AEDPA effective April 24, 1996. `See Wilcox v. Florida Department of Corrections*, 158 F.3d 1209, 1211 (11th Cir.1998), *cert. denied*, 531 U.S. 840, 121 S.Ct. 103, 148 L.Ed.2d 62 (2000) *and Goodman v. United States*, 151 F.3d 1335, 1337–38 (11th Cir.1998).

No evidentiary hearing is required because all of the facts germane to the Petitioner's claims of constitutional error are necessarily derived, in this instance, from the record of the state court proceedings. *Bolender v. Singletary*, 16 F.3d 1547, 1555 note 9 (11th Cir.1994), *cert. denied*, 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 315 (1983).

### The Claims Of The Petition

The Petition (Doc. 1) presents seven claims:

---

5. *See* the Florida Department of Corrections website at *www.dc.state.fl.US,* Inmate Population Information regarding Scott Burnside.

6. The trial judge, after declaring a manifest injustice, had held that under Florida law (*see Romero v. State,* 637 So.2d 7 (Fla. 4th DCA

1994)), inconsistent adjudications by an appellate court could be corrected only by the appellate court, not the trial court. The trial judge also mused that, if necessary, relief might be found in the federal system. (Petitioner's Appendix D, transcript of hearing, Oct. 9, 1996, pages 12–15).

*Ground One:* Failure to give requested jury instruction on "independent acts" in violation of the 6th and 14th Amendments.

*Ground Two:* Admission into evidence of a co-defendant's inculpatory confession in violation of the 6th Amendment right of confrontation as applied in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

*Ground Three.* Admission into evidence of a co-defendant's hearsay statements after conclusion of the alleged conspiracy in violation of the 6th Amendment right to confrontation.

*Ground Four.* Denial of Equal Protection and Due Process through inconsistent appellate decisions in parallel prosecutions for the same offenses involving the same facts and the same legal issue in violation of the 14th Amendment.

*Ground Five.* Denial of right to appeal by denial of right to submit a brief in violation of the 1st Amendment (access to the courts) and the equal protection and due process clauses of the 14th Amendment.

*Ground Six.* Denial of the right of confrontation through admission of unreliable hearsay not within a firmly rooted hearsay exception to the hearsay rule in violation of the 6th Amendment.

*Ground Seven.* Denial of relief based upon newly discovered evidence in violation of the 14th Amendment.

### *Standard Of Review*

The statute, 28 USC § 2254(d)(1), as amended by the AEDPA in 1996, provides that the writ shall not be granted to a state prisoner "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ... resulted in a decision that was contrary to, or involved an unreason-able application of, clearly established Federal law, as determined by the Supreme Court of the United States..."

Construing the new statute in *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000) the Supreme Court held:

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied— the state-court adjudication resulted in a decision that (1) 'was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of ... clearly established federal law, as determined by the Supreme Court of the United States.' Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

In this case, however, application of these principles is impeded by the fact that the state courts have consistently denied all of the Petitioner's claims without explanation except for his claim predicated upon inconsistent appellate decisions (Ground Four, *supra*). *See Sanders v. State,* 689 So.2d 410 (Fla. 5th DCA 1997), applying a procedural bar with respect to that claim.

Under these circumstances, it is impossible to ascertain whether the state court identified the correct Supreme Court precedent with respect to any of the Petitioner's claims on the merits, but the issue is moot because I have independently determined that all but Grounds Two and Three are meritless in any event. As to Grounds Two and Three, I have decided that either § 2254(d)(1) does not apply at all so that *de novo* review is appropriate;[7] or, alternatively, if the deference required by the statute is applicable, that the state court unreasonably applied clearly established Federal law as determined by the Supreme Court of the United States when it denied the Petitioner's Sixth Amendment claims presented here as Grounds Two and Three.

### Discussion—- Claims One And Four Through Seven

■ Petitioner's first claim, having to do with the sufficiency of the trial court's instructions to the jury and the assertion that the Petitioner was denied an instruction on his theory of defense, simply does not present a claim of constitutional dimension. "An error in instructing the jury cannot constitute a basis for habeas relief unless the error so infected the entire trial that the resulting conviction violates due process." *Jacobs v. Singletary,* 952 F.2d 1282, 1290 (11th Cir.1992) (citations omitted). *See also Agan v. Vaughn,* 119 F.3d 1538, 1545 (11th Cir.1997), *cert. denied,* 523 U.S. 1023, 118 S.Ct. 1305, 140 L.Ed.2d 470 (1998).

■ The jury instructions must be considered as a whole in the context of the entire trial. The jury was instructed on criminal conspiracy in accordance with the State's standard jury instructions, and was also instructed on the concept of principals, using both the standard jury instructions and Petitioner's special requested jury instruction. In sum, the record reflects that the jury was properly instructed, and prejudice of constitutional proportions did not result as a consequence of the trial judge's refusal to give the defense's special jury instructions. The jury was sufficiently informed of the correct legal standards and the State's burden of proof, and Petitioner's trial was not rendered fundamentally unfair because of the jury instructions.

■ Similarly, Petitioner's fourth and fifth claims, having to do with the inconsistent appellate decisions, and the appellate court's subsequent refusal to accept briefing of that issue, while troubling in this peculiar case, nonetheless fail to present claims of constitutional dimension. As Petitioner concedes, there are no reported Supreme Court decisions holding that anyone has a constitutional right, through the equal protection clause or otherwise, to consistent decisions from an appellate court. Any such doctrine would invite endless litigation and could even hinder the evolutional development of the law in the common law tradition. Appellate courts must have the right to change their minds and to decide for themselves whether any resulting inconsistency merits relief. The fact that the courts of Florida provide a procedure for reviewing the effect of allegedly inconsistent appellate decisions (*Romero v. State, supra,* note 6) afforded the Petitioner all of the process and equal protection he was due under the circumstances of this case.

■ The Petitioner's sixth claim relates to the admission of testimony by a witness,

---

**7.** *See Romine v. Head,* 253 F.3d 1349, 1365 (11th Cir.2001)("'[W]hen there is grave doubt about whether the state court applied the correct rule of governing federal law,

§ 2254(d)(1) does not apply. That is what we have here, so we proceed to decide the issue *de novo,* as the district court did'').

John Withers, that he was recruited by Barrett to assist in the killing of JoAnn Sanders. Withers' testimony, however, was admitted under Florida's statutory counterpart to Fed.R.Evid. 801(d)(2)(E)— the coconspirator exception to the hearsay rule [8]— and there was no constitutional error in violation of the Confrontation Clause of the Sixth Amendment. The coconspirator exception to the hearsay rule is a "firmly rooted" exception for purposes of satisfying the interests protected by the Confrontation Clause of the Sixth Amendment (*Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)); and, in this instance, there was sufficient evidence adduced during the state's case in chief to meet each of the predicate requirements of Fed.R.Evid. 801(d)(2)(e) [9] with respect to the admission of the disputed testimony given by John Withers.

 The Petitioner's seventh claim, based upon "newly discovered" evidence, is foreclosed by *Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.") Besides, the evidence the Petitioner points to as newly discovered— the testimony of the witnesses in the subsequent trials of Barrett and Burnside, and the fact of his father's acquittal— do not meet the requirements of "newly discovered" evidence in any event.

It follows that the Petitioner is not entitled to relief for any of the reasons presented in Ground One or in Grounds Four through Seven of the petition, and the petition will be Denied as to each and all of those claims.

### Discussion— Claims Two And Three

In these claims the Petitioner focuses upon the testimony of two different witnesses at his trial, and he asserts that in both instances he was denied his right of confrontation in violation of the Sixth Amendment.[10] The two witnesses in question were Paula Barrett, John Barrett's wife, and Donald Campbell, John Barrett's friend in Ohio.[11]

8. Florida Statute § 90.803(18)(e)(1990).

9. In deciding whether evidence admitted under an exception to the hearsay rule satisfies the requirements of the Confrontation Clause of the Sixth Amendment, one must look to federal, not state law, with regard to the issue of whether the exception as applied is "firmly rooted." *Lilly v. Virginia*, 527 U.S. 116, 126, 119 S.Ct. 1887, 1894, 144 L.Ed.2d 117 (1999). In this case, for example, Florida imposes a more stringent rule than the one announced in *Bourjaily, supra,* concerning the admission of coconspirator statements (*see Romani v. State*, 542 So.2d 984 (Fla.1989)), but so long as the evidence is admitted under the coconspirator exception as "firmly rooted" in federal law, the Confrontation Clause is satisfied. This is not a case involving a more liberal, state crafted exception to the hearsay rule as in *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). *See* also *Horton v. Zant*, 941 F.2d 1449, 1464–65 (11th Cir.1991), *cert. denied*, 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992).

10. The Confrontation Clause of the Sixth Amendment was made applicable to the states, through the Fourteenth Amendment, by *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The Confrontation Clause provides:

"In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ... and to have the assistance of counsel for his defence."

11. In terms of sequence at trial, Donald Campbell testified first and Paula Barrett testified later. However, the events about which Paula Barrett testified occurred before the events recounted by Campbell. I will there-

*The Testimony Of Paula Barrett*

■ Paula Barrett testified that John Barrett was her husband (though they were not legally married); that they had been living together for six years; and that they had two children. In 1990 they were living with Paula Barrett's mother at a rural address near Hawthorne, Florida, a few miles from Melrose where the Petitioner and Scott Burnside operated a used car business under the name International Auto Sales (R. 1304–05).

In January, 1990, the Barretts purchased a used automobile from Scott Burnside at the car lot in Melrose (R. 1309). Thereafter, from time to time, John Barrett would go to the car lot to work on the car as well as other vehicles on the lot in need of mechanical repair.[12] On some of these occasions Paula Barrett would accompany her husband and, in that process, a friendly relationship developed between the Barretts, Scott Burnside, and the Petitioner (R. 1311).

Paula Barrett then testified as follows (R. 1313–1315):

Q Did your husband ever tell you that he had been approached by anyone about killing someone?

A Yeah, he did.

Q Do you recall when the first time was that that conversation came up?

A It was when I was at work. I don't recall the day.

Q Okay. Was it before or after he started working at the Veteran's Administration?

A It was after.

Q Okay. Do you recall July 4th, 1990? Fourth of July? Remember what you did on the 4th of July last year?

A Yeah, yeah, I do.

Q Was it before or—

A It was before that.

Q Okay. So, after he started working at the VA, and before the 4th of July?

A Yeah.

Q All right. You were at work. Did he come to where you worked, or did he call you?

A He called me.

Q And what did he tell you?

A *He just told me that they had offered him to kill somebody, and he would get some money.*

Q *Did he say who had made the offer to him?*

A *He said Scott and Dorsey.*

Q *Okay. And you are referring to Dorsey Sanders, III?*

A *Yes, I am.* (Emphasis supplied)

Q Did he tell you where he was calling from?

A He was at the car lot. He didn't tell me he was at the car lot, but he was at the car lot.

Q Did he tell you any more over the phone?

A No.

Q Now, at that time, was the car lot still on Baden Powell Road?

A No, it wasn't.

Q Where was it?

A It was in Melrose, right next to a funeral home.

Q Okay. Did you talk about what you had talked about on the phone later on, face to face?

A Yes, we did.

Q What did he tell you at that time?

fore deal first with the testimony of Paula Barrett and then take up the testimony of Donald Campbell.

12. During this time Barrett also became employed as an orderly in the Veterans Administration Hospital in Gainesville (R. 1312).

A *He told me that he thought they were joking.* (Emphasis supplied)

Q Okay. Did he give you any more details?

A No.

Q Did he tell you why it was they wanted him to do this?

A No, not at that time.

Q Did he tell you who it was they wanted him to kill?

A Dorsey's mother.

Q Okay. Did John say any more about it after that?

A Not at that time, no.

Q Did he ever mention any money?

A Yeah, he did.

Q What did he tell you about money?

A He said they were going to pay him two— 20,000, something like that.

Q Did you ever hear John talk— move back a little bit, were you aware at that point that anyone else knew about this arrangement?

A At that point, no.

This testimony was admitted over the Petitioner's objection,[13] and his brief on appeal specifically asserted his present claim of a Sixth Amendment, Confrontation Clause violation citing *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). (R. Vol. 8, segment 59, Appellant's Initial Brief, page 13, Issues II, II(A) and II(B), and page 14, Summary of the Argument).

In this proceeding the State contends (Doc. 7, pages 19–20) that Paula Barrett's testimony was properly admitted under Florida Statute § 90.803(18)(e)(1990), a part of the Florida Evidence Code codifying the coconspirator exception to the hearsay rule;[14] and, the State argues, citing *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), that there was no Confrontation Clause violation under *Bruton* because the coconspirator exception to the hearsay rule is a "firmly rooted" exception thereby satisfy-

13. Earlier in the trial the court had entertained a proffer, out of the presence of the jury, concerning the predicate facts necessary to the admission of coconspirator statements under Florida Statute § 90.803(18)(e)(1990), a part of the Florida Evidence Code patterned after Fed.R.Evid. 801(d)(2)(E). (See note 14, *infra.*) After the trial judge ruled that there was independent evidence from which the jury could conclude that a conspiracy existed, the following discussion occurred (R. 1217–18):

> MR. DONNELLY [Defense Counsel]: Your Honor, could we just have a standing objection as to any evidence of co-conspirator statements?
> MR. KING [one of the Prosecutors]: As to this witness or to all witnesses?
> MR. BERNSTEIN [Defense Counsel]: All of the witnesses from this point forward.
> THE COURT: That agreeable with y'all?
> MR. TATTI [one of the Prosecutors]: Yes, sir. That's fine.
> THE COURT: Okay. There'll be a standing objection to all coconspirator statements for this trial.

14. Florida Statute § 90.803(18)(e)(1990) closely parallels Fed.R.Evid. 801(d)(2)(e), but it is not identical. The statute, enumerating exceptions to the hearsay rule, says:

> A statement by a person who was a coconspirator of the party during the course, and in furtherance, of the conspiracy. Upon request of counsel, the court shall instruct the jury that the conspiracy itself and each member's participation in it must be established by independent evidence, either before the introduction of any evidence or before evidence is admitted under this paragraph.

The second sentence of the statute, not found in Fed.R.Evid. 801(d)(2)(E) was the basis of the Florida Supreme Court ruling in *Romani, supra,* note 9, declining to follow the rule of *Bourjaily* which permits the consideration of a hearsay statement itself (as distinguished from independent evidence) in determining whether to admit the statement of a coconspirator.

ing the interests protected by the Sixth Amendment in the Confrontation Clause. *See also, United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986).

Here, unlike the testimony of Donald Campbell discussed *infra,* there is no issue of law concerning the relationship between the rule of evidence involved and the Confrontation Clause; if the evidence was properly admitted under the "firmly rooted" coconspirator exception to the hearsay rule, there was no constitutional violation. *Bourjaily* and *Inadi* clearly stand for that proposition. Conversely, if the evidence did not satisfy the requirements of the coconspirator exception to the rule, then there was not only an evidentiary error, there was also a violation of the right of confrontation as explicated in *Bruton* unless the reliability of the evidence has been demonstrated by a "showing of particularized guarantees of trustworthiness." *See* note 20, *infra.*

The question is, then, was the trial judge correct in admitting the testimony of Paula Barrett recounting John Barrett's statements to her as previously quoted?[15] Clearly, in my view, he was not. Taking Paula Barrett's testimony as truthful on its face, even assuming that a conspiracy to murder JoAnn Sanders was already in progress among and between other persons, there is nothing in this record from which the court or the jury could infer, let alone conclude, that the declarant John Barrett was, *at that time,* a member of the conspiracy *or* that his statements at that time were in furtherance of the conspiracy in any way.

More specifically, the testimony of Paula Barrett was that John Barrett "thought they were joking," testimony that can only be interpreted as wholly inconsistent with any conspiratorial agreement by John Barrett *at that time* to become involved in a scheme to commit murder. Furthermore, there is nothing within Paula Barrett's testimony, or any other evidence in the record, supporting a necessary finding that John Barrett's statements to his wife were anything but that— statements to his wife. There is nothing to show how those statements were, or were intended to be, in furtherance of the alleged conspiracy. She was not asked to do anything in response to or because of John Barrett's revelation, and it cannot be said (as contrasted with the testimony of John Withers, for example) that she was being recruited as a coconspirator.[16]

To lay a foundation for the admission of a coconspirator's statement, 'the government must establish by a preponderance of the evidence: (1) that a conspiracy existed, (2) that the defendant and the declarant were members of the conspiracy, and (3) that the statement was made during the course and in further-

---

**15.** In a post argument filing of supplemental authorities (Doc. 24), the State suggests that this precise issue was not presented to the state courts and is not exhausted. The State is simply wrong; the fundamental evidentiary issue underlying the denial of confrontation claim was specifically raised on the Petitioner's direct appeal (R. Vol. 8, segment 59, Appellant's Initial Brief, pages 33–35).

**16.** There was evidence that at a later time Paula Barrett purchased a gun for Scott Burnside, a gun apparently intended for use in the murder plot, and that she thereby became a member of the conspiracy herself (R.

1322–23; 1393–96). She also aided and abetted Barrett's flight after the murders by accompanying him to Ohio. She was charged with the latter offense under a plea bargain that resulted in a sentence of probation (R. 1306; 1369). The record is not clear as to whether she was charged with conspiracy, but it is clear that she has not been convicted of a conspiracy offense based on either a plea or a trial. Nonetheless, there was sufficient evidence to support a factual finding that she became a coconspirator, but not at the time described in her testimony previously quoted in the text.

ance of the conspiracy.' *United States v. Van Hemelryck,* 945 F.2d 1493, 1497–98 (11th Cir.1991).

*United States v. Schlei,* 122 F.3d 944, 980 (11th Cir.1997), *cert. denied,* 523 U.S. 1077, 118 S.Ct. 1523, 140 L.Ed.2d 674 (1998). *See also, e.g., United States v. Garcia,* 13 F.3d 1464, 1472 (11th Cir.1994), *cert. denied, Chaves v. United States,* 512 U.S. 1226, 114 S.Ct. 2723, 129 L.Ed.2d 847 (1994); *United States v. Christopher,* 923 F.2d 1545, 1550–51 (11th Cir.1991); *United States v. Perez–Garcia,* 904 F.2d 1534, 1540 (11th Cir.1990).

The decisions of the Supreme Court of Florida are to the same effect:

> Section 90.803(18)(e) provides that '[a] statement by a person who was a co-conspirator of the party [made] during the course and in furtherance of the conspiracy' is not inadmissible as evidence even though the declarant is unavailable as a witness. In order to admit evidence under this exception, the State must establish:
>
> > (1) that a conspiracy existed; (2) that the declarant/coconspirator and the defendant against whom the statements are offered were members of the conspiracy; and (3) that the statements were made during the course and in furtherance of the conspiracy.
>
> *State v. Edwards,* 536 So.2d 288, 292 (Fla. 1st DCA 1988); *see also* Charles W. Ehrhardt, *Florida Evidence* § 803.18e (2000 ed.).

*Brooks v. State,* 787 So.2d 765, 778–79 (Fla.2001).

The admission of Paula Barrett's testimony concerning hearsay statements made to her by John Barrett was error because those statements, offered to prove the truth of the matter asserted, were not made by a coconspirator during and in furtherance of the conspiracy; and, since

John Barrett did not testify at Petitioner's trial, that evidentiary error also violated the Petitioner's right of confrontation guaranteed by the Sixth Amendment unless there are other particularized guarantees demonstrating the trustworthiness of Barrett's hearsay.[17]

*The Testimony Of Donald Campbell*

■ Donald Campbell testified that he lived in Hamilton, Ohio; that he met John Barrett there in 1980; that he had not seen Barrett for over two years when, in August, 1990, Barrett appeared at Campbell's home; and that, after an afternoon of fishing together, Campbell and Barrett "went to a bar named Hobie's." (R. 980–82; 985). Then, over objection (R. 982–87), Campbell further testified as follows (R. 989–990):

Q During the course of that evening did John Barrett ever say anything to you about having killed someone?

A Yes, he did.

Q Do you recall where you were when he made those statements?

A At the bar, in Hobie's.

Q Okay. Do you recall approximately what time of night it was?

A A little after 10:00 P.M. in the evening.

Q Okay. Would you tell the ladies and gentlemen of the jury how the conversation came up?

A We was sitting there at the bar drinking and he kind of just started into it and he said, 'I was caught up in a whirlwind.' He said that, 'They called me the golden boy.' And I said, 'What do you mean, John?' He said, 'Well, I just killed four people in Citrus County, Florida.'

Q Did you respond to that in any way?

A I asked him, I said, 'Well, how did you do it? Did you shoot anyone?' He

---

**17.** The absence of such guarantees is discussed *infra.*

said, 'No. I killed them with a hammer and a pipe.'

Q At that point did you believe him to be serious about what he was telling you?

A Not at all. He was very calm about it.

Q Did you ask him anything else or did he say anything else about it?

A I asked him, I said, 'What'd you do it for?' And he said, '*I was contracted to go and do one. I was there, I done one. The other ones come in and I had to do those, too.*' (Emphasis supplied)

Q During the course of the evening did he say anything else about that particular subject?

A Not really. That's pretty well it.

Q And at the point you completed that conversation, did you believe what he was telling you to be the truth?

A Not really, because he didn't—— his attitude didn't change. He stayed the same. I mean, it was like he had no feeling about it.

The State contends in this proceeding (Doc. 7, page 19) that Barrett's incriminating statement to Campbell was admissible as a declaration against penal interest, one of the exceptions to the hearsay rule recognized by Florida Statute § 90.804(2)(c) (1990):

90.804 Hearsay exceptions; declarant unavailable.

\* \* \* \* \* \*

(2) HEARSAY EXCEPTIONS.— The following are not excluded under s.90.802, provided that the declarant is unavailable as a witness:

\* \* \* \* \* \*

(c) Statement against interest.— A statement which, at the time of its making, was so far contrary to the declarant's pecuniary or proprietary interest or tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a person in the declarant's position would not have made the statement unless he or she believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.

*See also,* Fed.R.Evid. 804(b)(3).

As alluded to earlier, the state appellate court found no evidentiary error in the admission of this testimony against Petitioner because his appeal raising the issue was denied without opinion. But when a different panel of the same court again confronted the same issue in Scott Burnside's appeal, a different result was reached.

The trial judge's second error was admitting the hearsay testimony of a friend of Barrett in Ohio with whom Barrett hid after his post-murder flight from Florida. Over objection, Donald Campbell was allowed to testify that Barrett had told him that Barrett had killed four people in Florida because it was necessary to do so in carrying out a contract to kill one. This testimony supported the state's argument that the four murders were the result of the original conspiracy involving Burnside rather than Barrett's independent acts that did not further the conspiracy. When Barrett spoke to Campbell after the murders, any conspiracy had ended; the statement was not the admission of a co-conspirator during the course and in furtherance of the conspiracy. *See* § 90.803(18)(e), Fla.Stat. (1991). *Nor was there any record showing or finding that John Barrett was unavailable to testify at Burnside's trial.* See § 90.804(1), Fla.Stat. (1991). There was no other argument presented that would provide a legal basis for the admission of the hearsay statement. (Emphasis supplied)

*Burnside v. State,* 656 So.2d 241, 244–45 (Fla. 5th DCA 1995).

The Florida appellate court was clearly correct in finding Campbell's testimony inadmissible against Burnside for the reasons it gave in the *Burnside* opinion; and it was equally inadmissible against Petitioner for the same reasons. There was no showing on the record in Petitioner's trial— in fact, there was no discussion of the subject at all— that Barrett was then "unavailable" as a witness, and unavailability is one of the expressed prerequisites to the admission in evidence of statements against penal interest.[18] *See* Fla. Stat. § 90.804(2) (1991); *see also,* Fed.R.Evid. 804(b).

The existence of a testimonial privilege, including the Fifth Amendment privilege against self incrimination, is one of the forms of unavailability recognized by the rule if the declarant "is exempted by a ruling of the court" on that ground. *See* Fla. Stat. § 90.804(1)(a) (1991); *see also,* Fed.R.Evid. 804(a)(1). To be sure, there are cases in which a formal ruling of the court sustaining the privilege has been found to be unnecessary in the context of a joint trial during which the declarant exercises his privilege by simply electing not to testify (*See United States v. Thomas,* 571 F.2d 285, 288 (5th Cir.1978)); but I have found no authority supporting a waiver of "a ruling of the court" on the issue of unavailability due to testimonial privilege in a case such as this where the declarant was not himself on trial at the time his out of court declaration was offered into evidence through another witness. It should also be noted that excluding Campbell's

testimony due to this flaw in the state's compliance with the rule is not a hypertechnical enforcement of the rule's requirements. While the likelihood that Barrett would have waived his privilege against testifying in Petitioner's trial may be small, given the fact that Barrett was then awaiting his own trial, it cannot be stated with certainty that he would have refused to testify if he had been called in Petitioner's case because Barrett did, in fact, testify as a witness in his own case within a matter of days after Petitioner's trial had concluded.

Thus, even if the against penal interest exception to the hearsay rule should be regarded as a "firmly rooted" exception for purposes of satisfying the Confrontation Clause of the Sixth Amendment, the Petitioner's right of confrontation was infringed by the admission of Barrett's out of court statements to Campbell because the conditions of the rule simply were not met.

■■■ Yet, in this instance there is more. Even if the threshold requirements of the rule had been met thereby clearing the way for the allowable entry into evidence of Barrett's confession to Campbell as an admission against penal interest, the Petitioner would still have his claim under the Sixth Amendment.

In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), a state prosecution for forgery and possession of stolen credit cards, the trial court received in evidence at trial the testimony of a witness previously given at a preliminary hearing in the case. The witness had since disappeared. The trial court admitted the earlier testimony under Ohio's counterpart to Fed.R.Evid. 804(b)(1),[19] and, ultimately,

---

**18.** The State does not argue that Barrett was unavailable in any physical sense. Indeed, Barrett was in the state's custody awaiting his own trial which was scheduled to begin immediately upon completion of the Petitioner's trial.

**19.** Rule 804. Hearsay Exceptions; Declarant Unavailable

\* \* \* \* \* \*

(b) Hearsay exceptions.— The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

the Supreme Court held that there was no violation of the Confrontation Clause of the Sixth Amendment. The court said (448 U.S. at 66, 100 S.Ct. at 2539):

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

Subsequently, in *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), and *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) the court clarified *Roberts'* requirement of a showing of "unavailability" for purposes of the Confrontation Clause and restricted that requirement, in effect, to those exceptions to the hearsay rule now enumerated in Fed.R.Evid.. 804(b).[20]

The court also established in *Inadi* and *Bourjaily*, as noted earlier in this memorandum opinion, that the coconspirator exception to the hearsay rule as presently embodied in Fed.R.Evid. 801(d)(2)(E) is a "firmly rooted" exception so that statements admissible under that exception are sufficiently reliable for admission under the Confrontation Clause as well.[21] Significantly, however, this is not true with respect to the admission of statements against penal interest.

In *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), the court uniformly held that an out of court confession by an accomplice inculpating the accused is "presumptively suspect" or "presumptively unreliable," or "inevitably suspect" and "dev-

---

(1) Former testimony.—- Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

**20.** *Roberts,* of course, only involved the former testimony exception as reflected, for purposes of federal law, in Fed.R.Evid. 804(b)(1). However, since *all* of the exceptions set out in Fed.R.Evid. 804 (unlike Fed.R.Evid. 801(d) and 803) require a showing that the declarant is unavailable, the same requirement necessarily exists *ipso facto* in the Confrontation Clause with respect to those same exceptions. Stated another way, the fact that hearsay might be admissible under the rules carving out exceptions does not necessarily mean that the Confrontation Clause is also satisfied unless the statement meets the predicate requirements for admission under a "firmly rooted" exception or is otherwise shown to have "particularized guarantees of trustworthiness." See *Lee v. Illinois*, 476 U.S. 530, 543, 106 S.Ct. 2056, 2063, 90 L.Ed.2d 514 (1986); *United States v. Ross*, 33 F.3d 1507, 1516 (11th Cir.1994), cert. denied, 515 U.S. 1132, 115 S.Ct. 2558, 132 L.Ed.2d 812 (1995); *United States v. Accetturo*, 966 F.2d 631, 634 (11th Cir.1992), cert. denied, Basha v. United States, 506 U.S. 1082, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993).

**21.** Though not directly pertinent to this case, the Supreme Court has also held that hearsay statements admitted under the "firmly rooted" exceptions relating to spontaneous declarations and statements made for medical treatment (see Fed.R.Evid. 803(2) and (4)) do not offend the Confrontation Clause. *White v. Illinois*, 502 U.S. 346, 112 S.Ct. 736 116 L.Ed.2d 848 (1992). However, in *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), the court held that Idaho's residual hearsay exception (patterned after what is now Fed.R.Evid. 807) is not a "firmly rooted" exception for Confrontation Clause purposes.

astating,"[22] so that the Confrontation Clause forbids its reception in evidence against the accused even when the jury is instructed, in a joint trial, that the confession of the accomplice cannot be considered as evidence against the accused. It is somewhat curious that none of these decisions discussed the issue of whether the against penal interest exception to the hearsay rule might supply the requisite level of reliability required by the Confrontation Clause. This is especially so with respect to the majority opinion in *Lee*, decided after *Ohio v. Roberts, supra*, in which the court first introduced the concept of "firmly rooted" exceptions to the hearsay rule as a surrogate for the right of confrontation.[23]

Then, in *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), the court again addressed the admission into evidence of the confession of an accomplice, and, on that occasion, the court did specifically address Fed.R.Evid. 804(b)(3), the against penal interest exception to the hearsay rule. The court held that, under the rule itself (not the Confrontation Clause), where the confession is an extended narration, only those parts

that are individually self-inculpatory are admissible. All other parts of the statement that are non-self-inculpatory, or self-exculpatory, or neutral collateral remarks, may not be admitted. That decision having been made, necessitating a remand for further proceedings in the court of appeals, the Supreme Court expressly declared that "we need not decide whether the hearsay exception for declarations against interest is 'firmly rooted' for Confrontation Clause purposes." 512 U.S. at 605, 114 S.Ct. at 2437.

More recently, in *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality opinion), the court squarely held that "accomplices confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." 527 U.S. at 134, 119 S.Ct. at 1899.[24]

Thus, as previously stated, even if the predicate requirements of the rule had been met (by a judicial ruling that Barrett was unavailable) thereby permitting, under the rules of evidence, the admission into evidence of Barrett's against penal interest

---

**22.** *Lee v. Illinois*, 476 U.S. at 541–542, 106 S.Ct. at 2062–2063 (1986).

**23.** Justice Blackmun, the author of the majority opinion in *Roberts*, did raise as a basis for his dissent in *Lee* (476 U.S. at 551, 106 S.Ct. at 2067 (1986)) the against penal interest exception to the hearsay rule as a justification for admitting the confession of the accomplice.

**24.** It is not necessary to determine whether *Lilly* is retroactive under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), because *Lilly* is not being applied in this instance to give the Petitioner the advantage of a new constitutional rule of criminal procedure. On the contrary, *Lilly* is relied upon merely to demonstrate that at the time of Petitioner's trial in 1991, the against penal interest exception to the hearsay rule had not

been determined to be a "firmly rooted" exception under the mode of analysis established by *Ohio v. Roberts* in 1980, and, in fact, has not been so recognized to this day as manifested by *Lilly*. It should also be remembered in this context that the Petitioner had no burden to demonstrate anything; it was the burden of the State, as the proponent of the evidence, to show that the against penal interest exception to the hearsay rule was an acceptable reason to admit the evidence notwithstanding the Confrontation Clause. It could not do so then and, even in the absence of *Lilly*, it could not do so now. In short, *Lilly* did not announce a new constitutional rule of criminal procedure benefitting defendants in criminal cases. Rather *Lilly* declined to announce a rule at the behest of the state thereby leaving a defendant's rights under the Confrontation Clause as they were.

statement to Campbell, the Confrontation Clause was violated because the against penal interest exception to the hearsay rule is not a firmly rooted exception for purposes of the Confrontation Clause and, as discussed below, there was no showing that the statement was otherwise reliable due to "particularized guarantees of trustworthiness." [25]

### Indicia of Reliability Through Particularized Guarantees of Trustworthiness

■ From and after *Ohio v. Roberts, supra*, the Confrontation Clause jurisprudence of the Supreme Court teaches that hearsay which is not admissible under a firmly rooted exception to the hearsay rule may yet be admitted without offending the right of confrontation if the statement is supported by "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539. The Court has added that such guarantees must inhere in the statement itself or the circumstances immediately surrounding it without considering possible corroboration in other evidence, *and* the trustworthiness of the hearsay statement must be such that confrontation through cross examination "would be of marginal utility" [26] in determining the truthfulness of the statement. See *Lee v. Illinois, Idaho v. Wright* and *Lilly v. Virginia, supra.* See also the Eleventh Circuit decisions in *United States v. Ross* and *United States v. Accetturo, supra*, note 20.

It is telling, however, that in none of the Supreme Court decisions to date has the Court determined that these stringent qualifications regarding particularized guarantees of trustworthiness have been met. In *Lee v. Illinois* the incriminating but unsworn post arrest statement of an accomplice inculpating the defendant was not found to be trustworthy even though it "interlocked" in some respects with the defendant's own statement. In *Idaho v. Wright* the statements of a child to an examining pediatrician were not found to be trustworthy merely because they were corroborated in part by other evidence. In *Lilly v. Virginia* the incriminating post arrest statement of the defendant's brother inculpating the defendant was not found to be trustworthy even though the statement was against the declarant's own interest and was corroborated by other evidence.

■ The State contends that both of John Barrett's hearsay statements to Paula Barrett and Donald Campbell, respectively, are supported by particularized guarantees of trustworthiness because both statements were made voluntarily, without leading or prompting, in private conversations with a family member or friend as distinguished from a post arrest, blame sharing statement to law enforcement officers at a time when there was reason to lie. I do not find this argument persuasive, however, because judicial skepticism of post arrest statements does not translate into added reliability of other hearsay statements merely because they were *not* post arrest admissions against interest. If it did, and that was all that was required to establish reliability, then any garden variety hearsay such as Barrett's casual conversation with his wife or his drunken barroom dialogue with his friend would become admissible under the Confrontation Clause even though they do

---

**25.** Before *Lilly* was decided in 2000 the Supreme Court of Florida had already held in 1997 that the against penal interest exception to the hearsay rule was not a "firmly rooted" exception under the law of Florida. *Franqui v. State*, 699 So.2d 1312, 1319 (Fla.1997), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1337, 140 L.Ed.2d 499 (1998).

**26.** *Idaho v. Wright*, 497 U.S. at 829, 110 S.Ct. at 3149.

not come within any firmly rooted exception to the hearsay rule. Moreover, the objective of identifying particularized guarantees of trustworthiness is to demonstrate that cross examination "would be of marginal utility" in determining the truthfulness of the statement. For example, in *United States v. Ross, supra,* note 26, the Eleventh Circuit concluded that cross examination of a custodian would be of marginal value in determining the reliability of a foreign business record; and in *United States v. Accetturo, supra,* note 26, the Eleventh Circuit held that cross examination would be of marginal value in determining the reliability of a handwritten statement by a *victim,* under oath, knowing that the truthfulness of the statement would be tested by subsequent investigation.

Here, especially with regard to the challenged testimony of Paula Barrett, the circumstances cry out for cross examination of the declarant, John Barrett, with respect to what he actually said and what was meant by what he said. Note that Paula Barrett quoted John Barrett as saying "they" had "offered him" to kill somebody. Then, when prompted by the examining prosecutor, she expanded to: "He said Scott and Dorsey." Then, in response to a leading question identifying "Dorsey Sanders, III," she replied: "Yes." Did "Dorsey" really mean the Petitioner or was it possible that John Barrett was referring to Dorsey, Jr.? Is it possible— even likely— that when "they" solicited John Barrett to commit murder the conversation was monopolized by Scott Burnside with the Petitioner merely being present? Similarly, the Barrett conversation

with Campbell did not refer to the Petitioner by name at all, although that was the clear inference intended by the offer of such testimony; and Barrett's reference to being "contracted to do one" cries out for the same cross examination.

The State cites to a number of decisions of the courts of appeal in which "particularized guarantees of trustworthiness" have been found to satisfy the Confrontation Clause and to justify the admission of hearsay statements not within a firmly rooted exception to the hearsay rule. However, all of those decisions are easily distinguishable from this case. For example, *United States v. Tocco,* 200 F.3d 401 (6th Cir.2000), *United States v. Boone,* 229 F.3d 1231 (9th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1747, 149 L.Ed.2d 669 (2001), *United States v. Shea,* 211 F.3d 658 (1st Cir.2000), *United States v. Westmoreland,* 240 F.3d 618 (7th Cir.2001), and *United States v. Robbins,* 197 F.3d 829 (7th Cir.1999), all involve cases in which the declarant made incriminating statements to relatives, girlfriends or a cell mate, and the statements were found to be trustworthy largely because they were against the penal interest of the declarant and not made to law enforcement authorities at a time when a blame shifting motive might exist.[27] Here, of course, John Barrett's statement to Paula Barrett was not *self* incriminating in any way and does not share that "guarantee of trustworthiness" with any of these decisions. Similarly, while Barrett's statement to Campbell was against Barrett's penal interest, it inculpated the Petitioner only when considered in conjunction with Paula Barrett's testi-

---

27. It might be said of these decisions that they stand for the proposition that a statement against penal interest is an indicia of reliability or a particularized guarantee of trustworthiness sufficient to satisfy the Confrontation Clause even though the same attribute cannot be characterized as a "firmly

rooted" exception to the hearsay rule. Whether that proposition is compatible with the Supreme Court jurisprudence may be debatable, but need not be decided in this instance because the decisions are so clearly distinguishable.

mony and it is *that* inference that begs cross examination in the peculiar circumstances of this case.

John Barrett's hearsay as related by Paula Barrett and Donald Campbell is not shown to be reliable by any "particularized guarantees of trustworthiness" such that cross examination would be of "marginal utility" in determining its truthfulness.

### The Inculpation Of The Petitioner

The testimony of Paula Barrett about John Barrett's statements to her identified the Petitioner by name and directly inculpated him in a way that was devastating to his case.

The testimony of Donald Campbell, however, did not identify the Petitioner by name and was damaging to the Petitioner only when heard and understood in conjunction with Paula Barrett's testimony (and, perhaps, the testimony of Withers discussed *infra* ). This raises a question as to whether Campbell's testimony was sufficiently inculpating of the Petitioner to be objectionable under the rules of evidence *or* the Confrontation Clause.

There is an entire line of cases approving, in a joint trial of two or more defendants, the technique of redacting an incriminating statement made by one of the defendants so as to eliminate any reference in the statement to the objecting defendant. That editing of the statement, coupled with a limiting instruction to the jury that the redacted statement may be considered only against the declarant and not against the objecting defendant, has been held to be an effective means of avoiding *Bruton* "problems" and permitting the redacted statement to be received in evidence. See, e.g., Richardson v. Marsh, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); United States v. Taylor, 186 F.3d 1332 (11th Cir.1999), reh'g denied, 210 F.3d 395 (11th Cir.2000); United States v. Arias, 984 F.2d 1139 (11th Cir.1993), cert. denied, 508 U.S. 979, 113 S.Ct. 2979, 125 L.Ed.2d 676 (1993); United States v. Vasquez, 874 F.2d 1515 (11th Cir.1989), cert. denied, 493 U.S. 1046, 110 S.Ct. 845, 107 L.Ed.2d 840 (1990).

Thus, if Barrett and the Petitioner had been tried together, and if a limiting instruction had been given to the jury, Barrett's statement to Campbell including the remark "I was contracted to go and do one," *might* have been admissible because of the lack of any specific reference to the Petitioner.[28] But this was not a joint trial and there was no limiting instruction given to the jury. The jury could only conclude, therefore, that Campbell's recitation of Barrett's confession was intended as evidence against the Petitioner— the only person on trial— and that the statement "I was contracted to go and do one" really meant "I was contracted *by Dorsey Sanders, III,* to go and do one."

The admission of Campbell's testimony was a violation of the Confrontation Clause just as surely as the admission into evidence of Paula Barrett's testimony relating John Barrett's statements to her.

### Harmless Error

■ Having concluded that the Petitioner's constitutional rights under the Confrontation Clause of the Sixth Amendment were violated, it does not necessarily

---

**28.** I emphasize *might* have been admissible because there is also a line of cases in which, even in joint trials, the admission into evidence of a redacted statement made by an accomplice has been held violative of the objecting defendant's right of confrontation where the redacted statement, despite the lack of any explicit reference to the objecting defendant, could reasonably be understood only as referring to that defendant. See, e.g., United States v. Petit, 841 F.2d 1546 (11th Cir.1988), cert. denied, 487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988); United States v. Bennett, 848 F.2d 1134 (11th Cir. 1988); United States v. Foree, 43 F.3d 1572 (11th Cir.1995).

follow that he is entitled to the writ if the record shows that the violation was harmless beyond a reasonable doubt under the rule of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), and *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999).[29]

After careful review of the entire record, I am unable to declare that the admission of John Barrett's extra judicial statements into evidence against the Petitioner was harmless beyond a reasonable doubt. On the contrary, the admission of those statements in my view was probably harmful to the point of being the evidentiary straw that broke the back of the Petitioner's defense.

A brief review of the evidence is in order. Other than Paula Barrett, the State's principal witness against the Petitioner was John Withers.[30] Withers testified that he was married to Paula Barrett's sister and was instrumental in getting John Barrett a job at the VA hospital where he and Barrett then worked together (R. 1218–1220). In the summer of 1990 Barrett approached Withers saying "we

could make $6,000 a piece if we do away with JoAnn Sanders ... because she was taking the farm and whatever Doc owned." (R. 1221–1222). Unwilling to rely on Barrett's statement, Withers went to see Doc Sanders (Dorsey Sanders, Jr., the Petitioner's father), and "he [Doc] said, well, he wanted it done." (R. 1222–1223). Significantly, there was no mention of Petitioner's involvement in the scheme at that time and, indeed, when Withers next talked to Barrett "he said nobody else knew." (R. 1224).[31]

Within a few days later, Barrett made plans for a reconnoitering trip to JoAnn Barrett's home in Floral City, approximately 90 miles from Melrose, "to go out there and check the area out." (R. 1226). Scott Burnside participated in that conversation and said "if she was home and we did it that we were supposed to make it look like a burglary." (R. 1226). The Petitioner was not present and, in fact, Withers said "they told me that Dorsey [the Petitioner] and none of them should ever find out."[32] (R. 1226).

Later a second trip to Floral City was planned. Barrett and Withers left from the ranch near Melrose. Several people

---

**29.** Both *Lee* and *Lilly* came before the Supreme Court on direct review, and in both cases the court left the harmless error analysis to the respective state courts on remand. This case, however, is before the court on collateral review, and the harmless error analysis must be done here because there is nothing to "remand" to the state courts. *See Cumbie v. Singletary,* 991 F.2d 715 (11th Cir. 1993), *cert. denied,* 510 U.S. 1031, 114 S.Ct. 650, 126 L.Ed.2d 608 (1993), *and Brown v. Dugger,* 831 F.2d 1547 (11th Cir.1987), both involving Confrontation Clause violations in 28 USC § 2254 proceedings in which the court of appeals did a harmless error analysis.

**30.** Much of the trial, of course, involved evidence that did not relate to the Petitioner, individually, such as the testimony of JoAnn Sanders about her activities on the day of the murders; testimony about her dissolution of

marriage proceedings; testimony of investigating officers and others about the discovery of the murdered men, and the causes of their deaths; and the testimony of John Withers about his recruitment by Barrett and Barrett's activities. The testimony and evidence against the Petitioner individually was sparse.

**31.** Withers was then asked by the Prosecutor: "Did you later find that to be incorrect?" And Withers answered "Yes" (R. 1224), but that cryptic exchange apparently referred to the subsequent participation of Scott Burnside, not the Petitioner.

**32.** The Prosecutor once again asked: "Did you later find out that that was not accurate?" Withers once again answered "Yes" (R. 1226–1227), and it is clear that the Petitioner did "find out," but knowledge and willful participation are two different things.

were standing around as they prepared to leave. Present were Doc Sanders and his wife, Scott Burnside and his wife, John Sanders (Petitioner's younger brother) and his girlfriend, and the Petitioner. Withers testified that "[t]hey said they were going to go out and be noticed," and that Petitioner was the one who made that remark. (R.1230). Then Withers testified: *"They said they were going to go out and make noise so they had an alibi, be noticed … [and that] [t]hey furnished us a Cougar XR7, I think it is."* (R. 1231, emphasis supplied). The "they" in this testimony was never explained.

On this second trip to JoAnn Sanders' home, Barrett and Withers actually gained entrance to the residence on a ruse of pretended car trouble, but Withers told Barrett "[t]here ain't no way I'm doing it" (R. 1237), and the two men then returned to Melrose. At the end of that week, according to Withers, he went to the car lot and had a conversation with John Barrett and Scott Burnside. The Petitioner was off to one side working on his automobile. Burnside and/or Barrett said to Withers that "we had to get it done," and Withers replied "I'm not going to do it." (R. 1240). The Petitioner then remarked, according to Withers, that "he [had] talked to his dad on the phone. He [Doc Sanders] said that as long as I know about it, it can't be done." (R. 1240–1241). Withers had no additional participation in the plot after that, and he testified as a witness for the state with an understanding that he would not be charged with any offense (R. 1262).

In addition to the critical testimony of Paula Barrett, previously quoted, she related that after her initial conversation with her husband, she began to work on

occasion in the office at the used car business and once heard Scott Burnside tell John Barrett that "it had to be done soon" (R. 1316–1317). However, the Petitioner, who was present, "didn't say anything." (R. 1318). On another occasion at the ranch, Paula Barrett testified that she saw John Barrett, Scott Burnside and the Petitioner in possession of what appeared to be a silencer made out of a piece of steel pipe. Burnside's wife and 12 year old son Charlie were also present.[33] The Petitioner helped John Barrett stuff the pipe with steel wool (R. 1325–1328), and Barrett and Burnside then test fired a weapon with the silencer attached; Petitioner did not take part in the test (R. 1328; 1364).[34]

On Friday August 3, 1990, the day of the murders, Paula Barrett was aware that John Barrett had left Melrose enroute to Floral City driving a Chevrolet Blazer provided by Scott Burnside as part payment for killing JoAnn Sanders (R. 1329–1332). When Barrett returned later, Burnside and his wife came to the Barretts' trailer home and the day's events were discussed (R. 1332). Notably, the Petitioner played no role in any of these transactions.

The next day, Saturday, August 4, after an outing at the beach, the Barretts encountered the Petitioner by happenstance during the evening at a convenience store in Melrose (R. 1333–1334). "Dorsey said that there were helicopters all over the place, and it would be better if we didn't go [home]." (R. 1334). "He told us not to go up that way because there were police officers and everything up there." (R. 1363). However, "he didn't tell us to leave town." (R. 1363). The following morning, John Barrett called Scott Burnside and arranged a meeting at a convenience store in Gainesville (R. 1335). When Burnside

---

**33.** Charlie Burnside was called as a witness and corroborated Paula Barrett's testimony concerning these events (R. 1416 et. seq.).

**34.** It was the state's theory that the silencer was the pipe later used in the bludgeoning deaths of the three victims who were killed in that manner.

arrived the Petitioner was a passenger in the automobile. Burnside exited the car and had a private conversation with John Barrett while the Petitioner remained in the automobile parked across the street (R. 1336–1337). Burnside apparently gave Barrett $300 and advised him to leave town, promising to send more money later (R. 1337).

Finally, James Doty, who sometimes did mechanical work for the used car business, testified that he once heard the Petitioner say to Scott Burnside at the car lot "I hate my mom. She's a bitch. And I wish she was dead." (R. 1434). However, Doty thought the Petitioner was simply "blowing up on his mom one day" (R. 1442), and he did not consider the Petitioner's statement as a threat of any kind (R. 1443).

That is the sum of the evidence as it relates to the Petitioner's personal involvement in the conspiracy; and, to be sure, bearing in mind that weight and credibility are issues for the jury to decide, there was ample proof that the Petitioner knew that a conspiracy was in progress to take the life of his mother and that he stood by and let it proceed. However, if Paula Barrett's testimony about John Barrett's initial conversation with her is removed from consideration, all of the other items of evidence are perfectly consistent with a mere presence defense.[35]

Withers' testimony that Petitioner said "they were going to go out and be noticed," even if interpreted as an expressed intent to fabricate an alibi, does nothing more than establish guilty knowledge, not willful participation; and the Petitioner's subsequent statement that if Withers "know[s] about it, it can't be done" appears to be a repudiation, not a statement of encouragement. Paula Barrett's testimony was that the Petitioner "didn't say anything" when he heard Burnside and Barrett discussing the plot; and, with respect to the silencer, the Petitioner's actions could easily be viewed as mere idle curiosity. He did not test the device and there was no evidence of any conversation, even between Barrett and Burnside, that the silencer was intended for use by Barrett in the conspiratorial scheme. Paula Barrett's testimony that Petitioner "told us not to go up that way because there was police officers and everything up there," could just as easily be interpreted as an innocent remark, not a conspiratorial one, because "he didn't tell us to leave town"; and, at the meeting between Barrett and Burnside the next day in Gainesville, the Petitioner remained in the car across the street, taking no part in the conversation. And, finally, Petitioner's statement, overheard by Doty, that he wished his "mom ... was dead" is wholly consistent with a common emotional outburst as distinguished from a conspiratorial resolve; and, in fact, that is precisely the way it was interpreted by Doty at the time.

In short, Paula Barrett's testimony that John Barrett said "Scott and Dorsey" were the ones who had "offered him to kill somebody" was the only evidence in the case that could not be explained away by the Petitioner as fully consistent with a mere presence defense. Moreover, there is a clear suggestion in the record that the jury fully recognized the important significance of that evidence. Shortly after retiring to commence their deliberations the jury sent a note to the trial judge requesting certain testimony including "Paula

---

**35.** The trial judge instructed the jury that "[n]either mere knowledge that an offense is being committed or presence at the scene of the crime is enough to establish participating in the crime as an aider and abetter." (R. 1735). *See Collins v. State,* 438 So.2d 1036, 1038 (Fla. 2d DCA 1983) ("Mere knowledge that an offense is being committed is not the same as participation with criminal intent, and mere presence at the scene ... is not sufficient to establish participation.")

Barrett. Dorsey's implication." (Petitioner's Appendix E).[36]

I am compelled to the conclusion that the admission into evidence of Paula Barrett's initial conversation with John Barrett, fortified by the subsequent testimony of Donald Campbell, both received in violation of the Confrontation Clause, was not harmless to the Petitioner beyond a reasonable doubt. On the contrary, in my view, both were harmful beyond a reasonable doubt although that conclusion, of course, is not necessary to a disposition of the case.[37] It also merits saying that Barrett's alleged statement to his wife about Petitioner's direct involvement at the beginning of the conspiracy is precisely the kind of statement that ought to be subject to the test of searching cross examination before it is submitted to the fact finder—the very interest that is safeguarded by the Confrontation Clause of the Sixth Amendment.

### *Conclusion*

The petition is DENIED as to Petitioner's Claims One and Four through Seven, and is GRANTED with respect to Claims Two and Three. The Clerk is instructed to enter judgment directing the Respondent to afford to the Petitioner, within one hundred twenty (120) days, a new trial consistent with this Memorandum Opinion as to each of the offenses charged against him, failing which the Petitioner shall be discharged from custody to go hence without day. The Court reserves jurisdiction to enforce the terms of the judgment.

IT IS SO ORDERED.

---

**36.** After consultation with the lawyers the judge instructed the jury that it would have to rely upon its own recollection of the testimony (R. 1754).

**37.** I would grant the writ on the basis of the admission of Paula Barrett's testimony alone, independently of any consideration of the testimony by Campbell.