*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0459p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

> *Plaintiff-Appellee,*

v.

WILLIAM ANTHONY JOHNSON (04-5110/6161) and
CHRISTOPHER L. STONE (04-5146),

> *Defendants-Appellants.*

Nos. 04-5110/5146/6161

>

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 02-00068—Thomas B. Russell, District Judge.

Argued and Submitted: October 26, 2005

Decided and Filed: November 30, 2005

Before: GILMAN and COOK, Circuit Judges; CARR, Chief District Judge.[*]

---

## COUNSEL

**ARGUED:** Stuart A. Scherer, SMITH & HELMAN, Louisville, Kentucky, for Appellants. Terry M. Cushing, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee. **ON BRIEF:** Stuart A. Scherer, John L. Smith, SMITH & HELMAN, Louisville, Kentucky, Patrick J. Bouldin, WESTERN KENTUCKY FEDERAL COMMUNITY DEFENDER, INC., Louisville, Kentucky, for Appellants. Terry M. Cushing, Monica Wheatley, James R. Lesousky, Jr., ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellee.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge. A 10-count indictment charged William Anthony Johnson and Christopher L. Stone, among others, with various violations of federal law, including the Racketeer Influenced and Corrupt Organizations Act (RICO), conspiracy to violate RICO, and fraud. Stone was tried before a jury and convicted of violating RICO and of conspiring to violate RICO. He was sentenced to concurrent terms of 240 months' imprisonment on each count and ordered to pay $166,653.07 in restitution. In a separate jury trial, Johnson was tried on and

---

[*]The Honorable James G. Carr, Chief United States District Judge for the Northern District of Ohio, sitting by designation.

convicted of four charges: RICO, conspiracy to violate RICO, uttering counterfeit obligations, and theft or receipt of stolen mail matter. He then pled guilty to three firearm and ammunition-related counts that had been previously severed from the other counts. The district court sentenced Johnson to life imprisonment for the RICO and RICO-conspiracy counts, 240 months for the uttering-counterfeit-obligations count, and 60 months for the theft-or-receipt-of-stolen-mail-matter count, to be served concurrently. On each of the firearms counts to which he pled guilty, he was sentenced to an additional 30 months of imprisonment, to be served concurrently with each other and with the other sentences. Finally, the district court ordered Johnson to pay $443,633.07 in restitution.

Both Johnson and Stone appeal their convictions on various grounds. Stone also challenges his sentence and restitution order. Johnson, however, did not appeal either his sentence or his restitution order. For the reasons set forth below, we **AFFIRM** the convictions of Johnson and Stone as well as the order requiring Stone to pay restitution, but **VACATE** Stone's sentence and **REMAND** his case for resentencing in accordance with *United States v. Booker*, 125 S.Ct. 738 (2005).

## I. BACKGROUND

### A.      Claims raised on appeal

Johnson and Stone raise various issues in this appeal. Stone argues that there was insufficient evidence for the jury to find a RICO "enterprise." Both Johnson and Stone claim that there was insufficient evidence that the RICO enterprise was engaged in or affected interstate commerce. Johnson claims that the admission of surreptitious recordings of conversations between Stone and another coconspirator violated Johnson's constitutional right of confrontation and was improper under the Federal Rules of Evidence. Finally, Stone argues that his sentence was invalid because it was based on facts not submitted to the jury, and that an improper amount of restitution was assessed against him.

### B.      RICO charges

#### 1.      *Evidence of a RICO "enterprise"*

Only Stone challenges the sufficiency of the evidence of a RICO enterprise. The indictment charged Johnson and Stone with, among other things, being employed by and associated with an enterprise that conducted its affairs through a pattern of racketeering activity. Several individuals were alleged to be involved in the criminal enterprise, including Johnson (whom the government claimed to be the leader), Stone, Curtis Hardin, and Sher Bolter.

Johnson, Stone, and Hardin met approximately five days per week for an hour to an hour and a half per meeting over an extended period of time. Occasionally others would attend these meetings as well. At the meetings, they would discuss the crimes that Johnson wanted the others to commit. This included talk about burning down houses to collect the insurance proceeds. Hardin testified that they discussed criminal schemes "just about everyday." He testified that his relationship with Johnson was for "business," and that the business was "crime." Hardin said the same relationship existed between Stone and Johnson.

The members of the alleged enterprise had different roles. Johnson made requests for certain items—like computers—that others would steal. Johnson was known as the "money man" who paid other members who did the "work" (often Stone and/or Hardin). After several burglaries, the stolen items would be delivered to Johnson's house. Johnson and Bolter would then sell the items. Although Johnson promised to pay them for their services, Stone and Hardin were rarely paid in full.

The government introduced evidence during the two trials to show that the following predicate acts alleged in the indictment were committed by members of the enterprise: nine acts of arson, one act of bank fraud, two acts of mail fraud, one act of tampering with a witness, and one murder. In committing the acts of arson, the general pattern was for Johnson to locate a house, make a down payment to the owner, sign a contract to purchase the property, obtain insurance, and then burn down the house himself or have others burn it down for him.

### 2.     *Evidence that the RICO "enterprise" was engaged in or affected interstate commerce*

Both Johnson and Stone challenge the interstate-commerce aspect of their RICO convictions. Although all of the houses that were burned down were located in Kentucky, several of the predicate offenses alleged to have been committed by the RICO enterprise involved interstate transactions and communications. One house that was burned was insured by a contract between Johnson and an insurance company based in Chicago, Illinois. Another house was being sold by an Evansville, Indiana company called UC Lending. Faxes and telephone calls were made between the Indiana offices of UC Lending and Johnson in Kentucky regarding this purchase, and the insurance contract for this house and the associated mailings were between Johnson and a Fairfield, Ohio insurance company. A Columbus, Ohio insurance company insured another of the burned houses and corresponded by mail regarding the policy and loss. Still another house that was burned was insured by a Seattle, Washington insurance company.

## C.     Admission of surreptitious recordings of Stone that implicated Johnson

In July of 1999, Hardin was arrested for stealing expensive Corvette wheels from coconspirator Sher Bolter's house. Hardin contacted the FBI after he was in prison and made a deal to become a government witness and confidential informant. As a result of this deal, he secretly recorded conversations with Johnson and Stone that ultimately filled 105 audio tapes. The government gave Hardin a recording device, instructed him in its use, and told him the subject matter that they wanted him to record.

In the proceedings against Johnson, the government moved for admission of the statements pursuant to Rule 804(b)(3) of the Federal Rules of Evidence, which is a hearsay exception for "statements against interest." Johnson contested the admission of Stone's statements at several stages of the proceedings. The district court ruled:

> Here, after review of the tapes and the record created at co-Defendant Stone's trial, it is apparent that significant and particularized guarantees of reliability exist. Co-Defendant Stone had a long-standing and close association with Hardin. He had no reason to suspect Hardin's complicity with law enforcement officials. He had no reason, in other words, to lie to Hardin or attempt to deceive him about the role that he, or the Defendant [Johnson], played in the various activities alleged in this case. He spoke freely about a large number of subjects, many of which were self-incriminating, and only a few of which dealt with the Defendant's allegedly shared culpability. Given these facts, this Court concludes that there are sufficient and particularized guarantees of trustworthiness in co-Defendant Stone's statements such that they satisfy the tests under the Confrontation Clause and Rule 804(b)(3).

The government was therefore allowed to play substantial portions of the recorded conversations between Hardin and Stone at Johnson's trial.

**D.    Stone's sentence and restitution claims**

*1.    Calculation of Stone's base offense level*

Stone submitted proposed jury instructions and proposed jury-verdict forms relating to the RICO and RICO-conspiracy counts. The proposed verdict forms included a section where the jury could determine which, if any, of the four predicate acts attributable to Stone were proven beyond a reasonable doubt. Of those four acts, one was a murder, two were arsons, and the last was mail fraud. At Johnson's trial, which took place after Stone's trial, the government requested and the court utilized a similar verdict form that allowed the jury to determine which predicate acts were proven. The government did not make such a request at Stone's trial, however, and the district court denied Stone's proposed verdict forms. Instead, a general verdict form was submitted to the jury that simply asked whether Stone was "Guilty" or "Not Guilty" of the RICO and RICO-conspiracy offenses. The jury found Stone guilty of both, but did not specify which of the predicate acts they found that Stone had committed.

The Presentence Report (PSR) included all four of the predicate acts in its sentencing calculations: "As the jury verdict did not specify which of these underlying acts Mr. Stone was found to have committed, the probation office has included all of these acts in its calculations, finding that the evidence clearly established his participation in each of the acts with which he was charged." The PSR found that the base offense level for murder was appropriate, which was 43 under United States Sentencing Guidelines (USSG) § 2A1.1.

Stone filed written objections to the PSR. Because only two predicate acts are necessary to support a RICO violation, and the jury did not determine which of the four predicate acts he had committed, Stone argued that the court should consider only the two lowest offenses in its base-offense-level calculation: one count of arson (base offense level of 24) and one count of mail fraud (base offense level of 6) under USSG §§ 2K1.4 and 2B1.1, respectively. Stone based his written objections on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and the rule of lenity. In the end, Stone claimed that the proper base offense level was for arson, that being 24 under USSG § 2K1.4.

At Stone's sentencing, the Assistant United States Attorney admitted his mistake in not urging the use of a predicate-acts-specific verdict form as the court ultimately utilized in Johnson's trial:

> Now, I made a mistake in the instructions. And I feel badly, both to the Court and to the people of the United States. My job is to be on top of the law. And I should have asked the Court for a specific instruction as we did in Johnson that each of the juror's would check off. But that — this court has heard this evidence, and knows that it's far beyond preponderance of the proof that this man murdered Sher Bolter or arranged for it and engaged in a conspiracy. There's overwhelming proof. And he admitted on the tapes the two other crimes.

The district court agreed with the government that all four predicate acts attributable to Stone were proven by a preponderance of the evidence, stating that it

> finds by a preponderance of the evidence that – that Mr. Stone was actively involved in all four of those – those acts that were alleged in act 1 [arson], 6(A) [arson], 6(B) [mail fraud] and act 10 [murder] of the – of the count 1 of the superseding indictments, and in the indictments in this case, and that the total offense level as set forth in the presentence investigation report, because it's really driven by [act] 10 is correct.

RICO carries a statutory-maximum sentence of 20 years. 18 U.S.C. § 1963(a). But if the jury finds that the defendant committed a predicate act that carries a maximum penalty of life imprisonment, the court can issue a sentence of life imprisonment for a RICO conviction. *Id.* Under Kentucky law, the murder that constituted one of the predicate acts alleged against Stone carried a maximum penalty of life imprisonment. Ky. Rev. Stat. Ann. § 507.020. The PSR concluded that the "guideline term for imprisonment" for Stone was life, taking into account the offense level for the predicate act of murder (offense level 43). Although the RICO statute would have allowed a sentence of life imprisonment based on the predicate act of murder in this case, the PSR went on to recommend a maximum sentence for Stone of 240 months. The district court ultimately imposed a sentence of 240 months instead of life imprisonment, stating that it was "guided by the statutory maximum."

### 2.        *Calculation of Stone's criminal history category*

The PSR also recommended that Stone be sentenced pursuant to criminal history category VI. In reaching this conclusion, the PSR considered several characteristics of Stone's previous convictions. Stone alleges that the criminal-history-category calculation necessitated findings as to:

- the date of commission for each previous offense;

- whether Stone was over or under age 18 at the time the previous offenses were committed in order to determine whether to apply USSG § 4A1.2(d) for juvenile offenses or USSG § 4A1.1(a)-(c) for other offenses;

- the date of entry of the conviction in order to determine if the previous offenses occurred within the time periods specified in USSG § 4A1.2(d) for juvenile offenses or USSG § 4A1.2(e) for other offenses;

- the length of the sentence imposed in order to assign the proper amount of points under USSG § 4A1.2(d) for juvenile offenses or USSG § 4A1.1(a)-(c) for other offenses; and

- whether Stone was under a criminal-justice sentence at the time he committed the RICO offenses in order to assess points under USSG § 4A1.1(d).

The PSR assessed points relating to 11 of Stone's 18 prior convictions. A total of 20 criminal history points were assigned. This put Stone in the highest criminal history category (category VI), the category for criminal history scores of 13 or above. Stone contended in his pre-*Booker* brief that the findings relating to his past convictions violate *Blakely v. Washington*, 542 U.S. 296 (2004), because they were not alleged in the indictment or found by a jury beyond a reasonable doubt.

### 3.        *Stone's obligation to make restitution*

At sentencing, the district court ordered Stone to make restitution based upon all four predicate offenses. He was ordered to pay $62,400 to CNA Insurance Company and $24,000 to Farm Bureau Mutual Insurance Company in connection with the so-called "Old Sheperdsville" arson and associated mail fraud. The district court also assessed $74,392 in favor of American National Insurance Company relating to the "Mell Road" arson. For the predicate act of murder, Stone was ordered to pay $5,861 to Diane Haskins.

Stone objected to paying restitution for the Mell Road arson and the murder offense. He argues on appeal that restitution for those two predicate acts is improper because he was not "convicted" of the offenses and he did not specifically agree in a plea agreement to pay restitution

for those acts. In accordance with his arguments relating to his base-offense-level category, Stone contends that the only restitution for which he is responsible relates to the two least-serious offenses: the "Old Sheperdsville" arson and the associated mail fraud.

## II. ANALYSIS

### A. Johnson's and Stone's RICO-conviction challenges

#### 1. *Standard of review*

In reviewing a sufficiency-of-the-evidence claim, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Copeland*, 321 F.3d 582, 600 (6th Cir. 2003) (quotation marks omitted). "We are bound to make all reasonable inferences and credibility choices in support of the jury's verdict." *United States v. Hughes*, 895 F.2d 1135, 1140 (6th Cir. 1990).

Johnson and Stone were charged with and convicted of violating 18 U.S.C. § 1962(c), which provides as follows:

> It shall be unlawful for any person employed by or associated with any *enterprise engaged in, or the activities of which affect, interstate or foreign commerce*, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*Id*. (Emphasis added.) They were also charged with and convicted of conspiring to violate the above-quoted statute, pursuant to 18 U.S.C. § 1962(d). The two arguments that Johnson and Stone raise regarding the sufficiency of the evidence are (1) whether there was sufficient evidence of an enterprise, and (2) whether there was sufficient evidence that the enterprise was engaged in or affected interstate commerce.

#### 2. *Evidence of an "enterprise"*

Stone alleges that there was insufficient evidence of a RICO enterprise. The RICO statute defines an "enterprise" to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Several cases further delineate the contours of the "enterprise" element. In *United States v. Turkette*, 452 U.S. 576 (1981), the United States Supreme Court stated:

> The enterprise is an entity, for present purposes a group of persons associated together for a *common purpose* of engaging in a course of conduct. . . . [This element] is proved by evidence of an *ongoing organization*, formal or informal, and by evidence that the various associates function as a *continuing unit*.

*Id*. at 583 (emphases added). The Seventh Circuit has elaborated as follows:

> The hallmark of an enterprise is structure. . . . [T]here must be *some structure*, to distinguish an enterprise from a mere conspiracy, *but there need not be much*. A RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to *hierarchical or consensual decision-making*. The continuity of an informal enterprise and the *differentiation among roles* can provide the requisite structure to prove the element of enterprise.

*United States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir. 1996) (citations and quotation marks omitted) (emphases added).

The *Turkette* Court alluded to the fact that proof of a pattern of racketeering activity could also be used to show the existence of an enterprise. *Turkette*, 452 U.S. at 583 ("While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other."). This court has adopted such a reading of *Turkette*:

> We agree that *Turkette* requires the government to prove both the existence of an "enterprise" and a "pattern of racketeering activity." We do not, however, read *Turkette* to hold that proof of these separate elements be distinct and independent, as long as the proof offered is sufficient to satisfy both elements.

*United States v. Qaoud*, 777 F.2d 1105, 1115 (6th Cir. 1985).

The evidence presented in Stone's trial showed that the alleged enterprise had structure. Johnson orchestrated the activities of the enterprise by deciding what crimes were to be committed, offering payment for their commission, and selling any stolen property. Stone and Hardin often performed the "work" (*i.e.*, committed the crimes). Johnson was the only one specifically named in the indictment as being responsible for some of the predicate acts, and neither side claims that Stone or Hardin had decision-making power of any kind. These facts illustrate a hierarchical decision-making structure and a division of labor among the various players, supporting the enterprise element of Stone's RICO conviction. *See Rogers*, 89 F.3d at 1337.

There was also evidence of a common purpose—to make money. Johnson was called the "money man," dictating the crimes to be committed but rarely paying the "workers" in full. Hardin and Stone were also making money by being paid at least partially for the crimes they committed. The common purpose of making money can support the enterprise element of a RICO conviction. *See, e.g.*, *United States v. Church*, 955 F.2d 688, 698 (11th Cir. 1992) ("This circuit has held that proof of an association's devotion to making money from repeated criminal activity demonstrates an enterprise's common purpose of engaging in a course of conduct, regardless of whether the criminal activity is diverse.") (citation and quotation marks omitted).

The enterprise element is also demonstrated by the evidence of crimes that its members were alleged to have committed. *See Qaoud*, 777 F.2d at 1115. Some of these crimes were alleged in the indictment as predicate acts (nine acts of arson, one act of bank fraud, two acts of mail fraud, one act of tampering with a witness, and one murder), while others were not (such as a burglary perpetrated by Stone and Hardin at Johnson's request to steal silver and jewelry). The jury was free to consider these facts in determining whether the government had sufficiently proven the element of enterprise. *See Qaoud*, 777 F.2d at 1115 (allowing proof of a "pattern of racketeering" to also be used to show an "enterprise"); *Turkette*, 452 U.S. at 583 (alluding to the same).

In addition to engaging in various criminal acts together, the members of the alleged enterprise considered themselves to be part of a business. For example, Hardin testified that his relationship with Johnson was one of "business," and that the business was "crime." He said the same of Stone's relationship to Johnson.

Finally, there was continuity to the alleged enterprise. *See Turkette*, 452 U.S. at 583. The indictment stated that the enterprise existed from February of 1998 through September of 2000. Continuity is demonstrated by the fact that numerous crimes were committed during the existence of the enterprise. In April of 1999, the first arson took place. The final act of the alleged enterprise was the murder of Sher Bolter in September of 1999. Between these dates, the members met on an almost-daily basis to discuss their activities.

Viewing the evidence discussed above in a light most favorable to the prosecution and making all reasonable inferences in support of the guilty verdict against Stone, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Copeland*, 321 F.3d at 600; *Hughes*, 895 F.2d at 1140.

### 3. *Evidence that the enterprise was engaged in or affected interstate commerce*

Both Johnson and Stone allege that there was insufficient evidence that the RICO enterprise was engaged in or affected interstate commerce. The RICO statute does not offer any guidance as to this element, other than defining the offense as requiring proof of an "enterprise engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(c).

Only a minimal impact upon interstate commerce is necessary to support a RICO conviction. *See, e.g.*, *United States v. Chance*, 306 F.3d 356, 373 (6th Cir. 2002) ("For purposes of a conviction under 18 U.S.C. §§ 1962(c) & (d), the government need only prove that the enterprise's racketeering activities had a de minimis connection with interstate commerce."); *Qaoud*, 777 F.2d at 1116 ("The law is well settled that for purposes of § 1962(c) the criminal enterprise need only have a *minimal* impact upon interstate commerce.") (emphasis in original).

The government concedes that it was required to prove that the *enterprise itself* was in some way connected to interstate commerce, not just that the individual acts of racketeering activity had such a connection. But the interstate nature of the predicate acts themselves can establish the required connection between the enterprise and interstate commerce. *United States v. Bagnariol*, 665 F.2d 877, 893 (9th Cir. 1981) ("The interstate commerce nexus must result from the enterprise. It is permissible to find that nexus from acts also charged as predicate acts when those constitute the activities of the enterprise.").

In this case, the predicate acts impacted interstate commerce in essentially three ways: (1) one of the houses purchased and then burned was bought in an interstate real estate transaction, (2) several of the houses that were burned were insured by out-of-state insurance companies, and (3) various interstate telephone calls, facsimiles, and mailings were made with respect to several of the purchases and the related insurance claims.

Caselaw from several circuits holds that similar connections with interstate commerce are sufficient to support a RICO conviction. *See United States v. DiFrancesco*, 604 F.2d 769, 775-76 (2d Cir. 1979), *rev'd on other grounds*, 449 U.S. 117 (1980) (holding in a RICO case involving acts of arson and use of the mails to defraud insurance companies that the district court properly determined as a matter of law that if $480,000 in insurance claims was found by the jury to have been paid by out-of-state insurance companies as a result of the arsons and mail fraud, the element of interstate commerce was established); *United States v. Barton*, 647 F.2d 224, 234 (2d Cir. 1981) (holding that the interstate-nexus element of a RICO conviction was satisfied, in part due to the fact that a car that was bombed was insured by an out-of-state insurance company); *United States v. Muskovsky*, 863 F.2d 1319, 1325 (7th Cir. 1988) (holding in a case involving illegal prostitution at a nude dancing establishment that "[g]iven the minimal effect on commerce needed to satisfy the 'jurisdictional' element, the telephone use by the Roman House sufficiently affects interstate commerce to satisfy the RICO nexus requirement"); *United States v. Altomare*, 625 F.2d 5, 8 (4th Cir. 1980) (concluding that the interstate commerce nexus was present in part on the basis of interstate telephone calls).

Viewing the evidence that established a connection between the enterprise and interstate commerce in a light most favorable to the prosecution, and making all reasonable inferences in support of the guilty verdicts against Johnson and Stone, a rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt. *See Copeland*, 321 F.3d at 600; *Hughes*, 895 F.2d at 1140.

**B.       Johnson's challenges related to the admission of Stone's statements**

*1.       Standard of review*

Johnson challenges the admission of statements made by Stone and recorded surreptitiously by Hardin at the behest of the government. The parties dispute the standard of review applicable to this issue. Johnson argues that we should review the matter de novo, while the government contends that reversal is proper only if the district court abused its discretion.

We will review Johnson's Confrontation Clause challenge de novo. In *United States v. Pugh*, 405 F.3d 390 (6th Cir. 2005), this court was presented with a claim analogous to Johnson's. Pugh was convicted in 2002 of conspiracy to commit bank robbery and of aiding and abetting a bank robbery. *Id*. at 394-96. He presented a Confrontation Clause challenge to the admission of hearsay statements against him. *Id*. at 397. In analyzing the issue, the court noted that the typical standard of review for evidentiary rulings is abuse of discretion. *Id*. The court then went on to recite the traditional rule from *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), that "any out-of-court testimonial statement made by an unavailable declarant could be admitted provided that the judge found that it bore adequate indicia of reliability." *Id*. at 398.

But that was neither the standard of review nor the substantive rule that the *Pugh* court applied. The court noted that since Pugh's conviction, the Supreme Court had decided *Crawford v. Washington*, 541 U.S. 36 (2004), which changed the Confrontation Clause analysis. *Pugh*, 405 F.3d at 398. This new analysis was applied in Pugh's case, even though he was convicted before *Crawford* was decided and despite the normal abuse-of-discretion standard of review. *Id*. at 399 & n.7 (citing *Griffith v. Kentucky*, 479 U.S. 314, 322-23 (1987) ("[A]fter we have decided a new rule in the case selected, the integrity of judicial review requires that we apply that rule to all similar cases pending on direct review.")). In accordance with *Pugh*, we review Johnson's claim under *Crawford* pursuant to the de novo standard because Johnson's appeal was pending when *Crawford* was decided.

*2.       Challenge based on Johnson's right to confrontation*

*Crawford* held that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68. By its own terms, this rule is applicable only if the contested evidence is testimonial in nature. The parties dispute whether Stone's out-of-court statements were testimonial or nontestimonial.

The *Crawford* Court did not articulate a test to determine whether a statement is testimonial. *Crawford*, 541 U.S. at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"). This court, however, has stated that the focus of the testimonial inquiry is on the declarant:

> The proper inquiry, then, is whether the *declarant* intends to bear testimony against the accused. That intent, in turn, may be determined by querying *whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.*

*United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004) (emphases added).

In this case, the declarant is Stone because he was the one whose statements were admitted against Johnson. The question, therefore, is whether a reasonable person in Stone's position would anticipate his statements being used against Johnson in a criminal investigation or prosecution. *See id.* The district court found that "Co-Defendant Stone had a long-standing and close association with Hardin. He had no reason to suspect Hardin's complicity with law enforcement officials. He had no reason, in other words, to lie to Hardin or attempt to deceive him about the role that he, or the Defendant [Johnson], played in the various activities alleged in this case." At Johnson's trial, Hardin testified that he had known Stone for over 25 years. Johnson also repeatedly labels the recording of Stone's statements "surreptitious," meaning that Stone did not know that his statements were being recorded.

Based on the longstanding relationship between Stone and Hardin and the fact that Stone was unaware that his conversations were being recorded, a reasonable person in Stone's position would not have anticipated that his statements would be used in a criminal investigation and prosecution of Johnson. For this reason, the statements at issue are not testimonial, *see Cromer*, 389 F.3d at 675, and the rule announced in *Crawford* is inapplicable by its own terms. *See Crawford*, 541 U.S. at 68.

The fact that Stone's statements were nontestimonial, however, does not necessarily compel the conclusion that they were properly admitted over a Confrontation Clause objection. Although *Crawford* reformed the Confrontation Clause analysis regarding out-of-court testimonial statements, this court has held that the *Ohio v. Roberts*, 448 U.S. 56 (1980), line of cases continues to control as to nontestimonial statements. *United States v. Franklin*, 415 F.3d 537, 546 (6th Cir. 2005) ("[W]ith respect to non-testimonial hearsay statements, *Roberts* and its progeny remain the controlling precedents.").

In *Roberts*, the Court held as follows:

> [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Ohio v. Roberts*, 448 U.S. 56, 66 (1980). An out-of-court nontestimonial statement can thus be admitted against a criminal defendant if (1) the declarant is not available for cross-examination at trial, and (2) there are adequate "indicia of reliability," either in the form of (a) the satisfaction of a firmly rooted hearsay exception or (b) particularized guarantees of trustworthiness.

We will deal with the second prong of the analysis first. The government does not allege that the statements at issue fall within a firmly rooted hearsay exception. Such a claim would fail in any event because this court does not consider the statement-against-interest exception to be firmly rooted. *Franklin*, 415 F.3d at 545 ("We do not agree with the government . . . that the statement against penal interest exception to the hearsay rule is firmly rooted."). For this reason, the only "indicia of reliability" that could satisfy the second prong of the *Roberts* analysis is that of particularized guarantees of trustworthiness. *See Roberts*, 448 U.S. at 66. This court in *Franklin* held as follows with regard to that prong:

> To determine whether a statement is sufficiently trustworthy for admission under Rule 804(b)(3), the court is not to focus on whether other evidence in the case corroborates what the statement asserts, but rather on whether there are corroborating circumstances which clearly indicate the trustworthiness of the statement itself.

*Franklin*, 415 F.3d at 547 (citation and quotation marks omitted).

The district court admitted Stone's statements upon a finding of "sufficient and particularized guarantees of trustworthiness." In attacking this evidentiary ruling, Johnson points out inconsistencies "in the statements themselves and [with] the facts the government sought to establish thereby." Such inconsistencies or lack of corroboration are not the focus of our inquiry, however. *See Franklin*, 415 F.3d at 547. Rather, the focus is on the circumstances surrounding the making of the statement itself.

The *Franklin* case demonstrates this premise. Franklin challenged the admission of out-of-court statements made by Clarke, a codefendant. *See Franklin*, 415 F.3d at 543. Clarke had made statements that inculpated Franklin to a friend of over 15 years named Wright. *Id*. Wright testified to these statements at the joint trial of Franklin and Clarke, over their objection. *Id*. at 544. After concluding that the *Roberts* line of cases controlled regarding these nontestimonial statements, this court held that Clarke's statements to Wright bore sufficient guarantees of trustworthiness and were thus admissible against Franklin. *Id*. at 547-48. In support of its conclusion, the *Franklin* court articulated the following analysis:

> First, Clarke *made the self-inculpatory statements not to investigators but to his close friend*. Consequently, to the extent that the statements inculpated Franklin, there is no basis to conclude that Clarke intentionally did so to curry favor with law enforcement. . . . In contrast to cases in which a declarant confesses to law enforcement but additionally implicates his accomplice in the crime, *this case involves statements the declarant (Clarke) made in confidential exchanges with a long-time friend—a friend he had no reason to conclude would reveal those statements to law enforcement*.

*Id*. at 548 (emphases added). The facts noted above go to the circumstances surrounding the making of the statements themselves, not to whether the substance of the statements was corroborated by other facts in the record.

Turning to the case at hand, the district court relied on three factors in support of its finding of "sufficient and particularized guarantees of trustworthiness": (1) the length of Stone's and Hardin's relationship (over 25 years), (2) the fact that Stone had no reason to suspect that Hardin was cooperating with law enforcement and therefore had no motivation to lie to or deceive him, and (3) that Stone spoke freely about many subjects, "only a few of which dealt with the Defendant's allegedly shared culpability." These factors establish that the district court properly focused its inquiry on the circumstances surrounding the making of the statements themselves rather than the question of whether the substance of the statements was corroborated by other facts in the record. With respect to the second prong of analysis under *Roberts*, we therefore find particularized guarantees of trustworthiness regarding Stone's surreptitiously recorded statements. *See Roberts*, 448 U.S. at 66.

Returning now to the first prong of analysis under *Roberts*, the hearsay declarant must be unavailable for cross-examination at trial. *Id*. In the proceedings below, the only thing that Johnson did to arguably raise the issue of unavailability was in a pretrial brief opposing the motion of the government to admit Stone's statements. He quoted at length from *Sanders v. Moore*, 156 F. Supp. 2d 1301 (M.D. Fla. 2001), where the court discussed the issue of unavailability as part of its Confrontation Clause analysis. The district court below, in its pretrial ruling on the government's motion, did not make any specific finding as to whether Stone would invoke his Fifth Amendment privilege if called to testify. At trial, as the recordings were about to be played, Johnson's counsel said: "Let me take this opportunity to renew my objection to Mr. Stone's tapes being played against Mr. Johnson." This statement properly preserved Johnson's objection to the evidentiary question at issue.

On appeal, however, Johnson barely mentions the issue of Stone's unavailability. In a footnote in his initial brief that is again referenced in his reply brief, Johnson raises the matter of Stone's unavailability in a challenge to the applicability of Rule 804(b)(3) of the Federal Rules of Evidence. The footnote points out that

> [w]hile the government premised its Motion upon the presumed fact that Stone would be "unavailable" due to the invocation of his Fifth Amendment right not to testify[,] the government did not attempt to call Stone as a witness nor secure a ruling of the court on this point as required under Rule 804(a)(1).

(Citations omitted and emphasis removed.) Johnson's briefs contain no other discussion about Stone's unavailability for Confrontation Clause purposes.

"[A]n appellant abandons all issues not raised and argued in its initial brief on appeal." *United States v. Still*, 102 F.3d 118, 122 n.7 (5th Cir. 1996) (citation and quotation marks omitted) (emphasis removed). Furthermore, "it is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) (citation and quotation marks omitted). Johnson's only reference to the issue of Stone's unavailability is limited to the single footnote and is not otherwise developed in his initial brief. The point is not made in his statement of issues nor contained in any of his argument headings. Based on this perfunctory mention of the issue in Johnson's initial brief, we conclude that he has waived the issue of Stone's unavailability for purposes of both his Confrontation Clause and Rule 804 challenges.

In any event, we have grave doubt that Johnson would have succeeded on the merits of the unavailability issue. The declarant (Stone) and the defendant (Johnson) were originally codefendants whose trials were severed upon Stone's motion. They were tried within three weeks of each other on the same RICO charges, with Stone first and then Johnson. Stone elected to not testify at his own trial and had not yet been sentenced when Johnson's trial was taking place. Under these specific facts, the existence of Stone's privilege and the virtual certainty that he would have asserted it if called as a witness are "patent," and for us to require a new trial on the basis that the Rule 804 procedural requirements were not fulfilled would be "mere formalism." *Cf. United States v. Thomas*, 571 F.2d 285, 288 (5th Cir. 1978) (concluding that a witness was unavailable when the existence and validity of privilege were "patent"); *United States v. Young Bros., Inc.*, 728 F.2d 682, 691 (5th Cir. 1984) (holding that two witnesses were unavailable where "[i]t was clear to all participants that each claim would have been made," and to require the Rule 804 procedures to be fulfilled would be "mere formalism") (citations omitted).

On the other hand, this whole issue could have been avoided if the district court had explicitly considered and ruled on the issue of availability pursuant to Rule 804(a)(1). Its failure to do so in the case before us, however, is perhaps understandable where neither party expressly brought the issue to the court's attention and everyone implicitly knew that Stone would not waive his Fifth Amendment privilege.

### 3. *Johnson's challenge under Rule 804(b)(3) of the Federal Rules of Evidence*

In addition to challenging the admission of the Stone recordings on Confrontation Clause grounds, Johnson claims that the district court committed error by failing to perform the required factual analysis under Rule 804(b)(3) of the Federal Rules of Evidence. Johnson's brief notes that "a large number of Stone's statements admitted at trial had nothing to do with any criminal activity." (Emphasis removed.) Based on this fact, he argues that "[t]he only conclusion which can be drawn is that the District Court failed to conduct the required 'fact-intensive inquiry' into the separate

admissibility of each 'single declaration or remark.'" He bases this argument on the case of *Williamson v. United States*, 512 U.S. 594 (1994), in which the Supreme Court stated:

> In our view, the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory. The district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else.

*Id*. at 600-01. Johnson further relies on this court's interpretation of *Williamson*:

> [W]hen ruling upon a narrative's admissibility under [Rule 804(b)(3)], a court must break it down and determine the separate admissibility of each "single declaration or remark." This exercise is "a fact-intensive inquiry" that requires "careful examination of all the circumstances surrounding the criminal activity involved."

*United States v. Canan*, 48 F.3d 954, 959 (6th Cir. 1995).

Although Johnson makes the general assertion that the district court failed to perform a factual inquiry that meets the requirements of *Williamson* and *Canan*, he offers no supporting evidence. He makes only two references to the transcript of the Stone recordings, and these had to do with "Hardin's parole officer and health problems" and Hardin's and Stone's "past gastronomic and culinary experiences." Johnson fails to explain how those statements violate Rule 804(b)(3). He has therefore failed to show that the district court abused its discretion.

Furthermore, even if the district court did err in not parsing Stone's statements pursuant to Rule 804(b)(3), the error was harmless. "We review the district court's evidentiary decisions for abuse of discretion, and we will reverse only when we find that such abuse of discretion has caused more than harmless error." *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994). "The harmless error standard calls for reversal when the appellate court lacks a fair assurance that the outcome of a trial was not affected by evidentiary error. We shall, therefore, reverse the lower court only if we are firmly convinced that a mistake has been made." *McCombs v. Meijer, Inc.*, 395 F.3d 346, 358 (6th Cir. 2005) (citations and quotation marks omitted).

The only statements that Johnson specifically takes issue with in his brief have nothing to do with any criminal activity. This being so, we can be fairly certain that "the outcome of the trial was not affected by [any] evidentiary error." *Id.*

## C.     Stone's arguments relating to his sentence

### 1.     *Offense-level calculation*

In Stone's written objections to the PSR, he premised his argument on the Sixth Amendment case of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). His counsel further cited *Apprendi* at sentencing and noted his Sixth Amendment objections to the proposed sentence. Because Stone has preserved this constitutional challenge for appeal, the proper standard of review is de novo. *Copeland*, 321 F.3d at 601 ("This court reviews a constitutional challenge to a defendant's sentence de novo wherever the defendant preserves the claim for appellate review.") (emphasis removed).

The parties in their briefs disagreed as to whether the principles announced in *Blakely* apply to the United States Sentencing Guidelines. After the briefs were filed, however, the Supreme Court issued its opinion in *United States v. Booker*, 125 S.Ct. 738 (2005). In a recent case, this court has made clear that, under the circumstances, the proper analysis of Stone's claim is under *Booker*:

> While this case was pending on appeal before this Court, the Supreme Court issued its decision in *United States v. Booker*. In *Booker*, the Supreme Court extended its Sixth Amendment holding in *Blakely v. Washington*, --- U.S. ----, 124 S.Ct. 2531, 2536-37, 159 L.Ed.2d 403 (2004), to the federal Sentencing Guidelines, holding that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by the plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S.Ct. at 756. In so holding, the Court expressly stated that its decision in *Booker* must be applied "to all cases on direct review." *Id.* Because this case was pending on direct review when *Booker* was decided, the holdings of *Booker* are applicable in the present case.

*United States v. Yagar*, 404 F.3d 967, 969 (6th Cir. 2005).

The starting point for the *Booker* analysis is to determine the maximum sentence authorized under the facts as found by the jury. Stone was found guilty of RICO and RICO-conspiracy violations. Pursuant to the Sentencing Guidelines, the base offense levels for a RICO and RICO-conspiracy conviction are the greater of 19 or "the offense level applicable to the underlying racketeering activity." USSG § 2E1.1. Stone was alleged to have participated in four predicate acts. The PSR concluded that one of the incidents of arson carried a base offense level of 24. Another arson and its associated mail fraud were grouped, also producing a base offense level of 24. The fourth predicate act, murder, had a base offense level of 43.

In Stone's case, the jury did not specify which of the predicate acts were applicable to him. This happened because the district court denied his request to use a verdict form that allowed for such a determination. Despite the lack of jury findings, the PSR concluded that the "evidence clearly established his participation in each of the acts" and recommended that the murder guideline of 43 be utilized. The district court ultimately agreed, stating that it found by a preponderance of the evidence that Stone had committed all four predicate acts and that the murder guideline was therefore appropriate. Although the RICO statute and the Sentencing Guidelines would have allowed the district court to impose a life sentence on Stone, the sentence actually imposed was the unadjusted 20-year statutory maximum for RICO convictions. *See* 18 U.S.C. § 1963(a) and the USSG Sentencing Table.

We have no way of knowing whether Stone's jury found beyond a reasonable doubt that he had committed only two of the predicate acts required for a RICO conviction, or three, or even all four. If the jury did find that he committed only the minimum of two offenses needed to support a conviction, these two offenses *could have* included the murder, which carried a base offense level of 43. But all of this is mere speculation. By finding that he had committed all four predicate acts by a preponderance of the evidence and sentencing him accordingly, the district court deprived Stone of his Sixth Amendment right to trial by jury. *See Booker*, 125 S. Ct. at 756.

There are two ways for us to remedy this violation. One is to grant Stone a new trial and order the use of a verdict form that would allow the jury to designate which predicate acts it found were committed beyond a reasonable doubt. The other is to accept Stone's position that he is entitled to be resentenced with the Guidelines base offense level being fixed at 24. Stone argues that the grouped arson and mail fraud acts were the least serious of the predicate acts in which he was alleged to have participated, and that the rule of lenity compels a sentence based only on those acts.

We choose the second option, entitling Stone to be resentenced with the Guidelines base offense level being fixed at 24. Stone himself does not argue for the first remedy, nor does the government. The second remedy, for which Stone does argue, is a more reasonable solution in terms of judicial economy. In order to support a RICO conviction, the jury must have determined that

Stone committed *at least two* acts of racketeering activity. 18 U.S.C. § 1961(5). We have no basis to conclude for sentencing purposes that Stone committed more than two such acts, nor is there any means to determine which of the four acts were found by the jury to involve Stone. In situations like this, the principles that underlie the rule of lenity counsel that ambiguities should be resolved in favor of the defendant. *United States v. Thomas*, 211 F.3d 316, 321 (6th Cir. 2000) (Clay, J., concurring) (stating that the rule of lenity resolves ambiguities in favor of the criminal defendant); *United States v. Boucha*, 236 F.3d 768, 775 (6th Cir. 2001) ("Courts may apply the rule of lenity to interpret the sentencing guidelines.").

### 2.        *Criminal-history-category calculation*

Stone also challenges the calculation of his criminal history category. Consistent with the standard of review utilized in the analysis of Stone's base offense level, we review his constitutional challenge to his criminal history category de novo. *See Copeland*, 321 F.3d at 601.

"[T]his circuit has repeatedly held . . . [that] certain aspects of the character of prior convictions are so basic as to be implicit in the fact of a prior conviction." *United States v. Hollingsworth*, 414 F.3d 621, 623 (6th Cir. 2005); *see also United States v. Barnett*, 398 F.3d 516, 524 (6th Cir. 2005) ("This Court, among others, has rejected the argument that *Apprendi* requires the nature of prior convictions to be determined by a jury, holding instead that the district court's authority to determine the existence of prior convictions was broad enough to include determinations regarding the nature of those prior convictions."); *United States v. Burgin*, 388 F.3d 177, 186 (6th Cir. 2004) ("In the usual case, we expect that a district court's determination that a defendant has a record of prior convictions will be accompanied by the judge's determination of when those convictions were entered."); *United States v. Santiago*, 268 F.3d 151, 156-57 (2d Cir. 2001) (discussing, in a pre-*Booker* and pre-*Blakely* case, the "different occasions" requirement for prior crimes in 18 U.S.C. § 924(e) and stating that "[j]udges frequently must make factual determinations for sentencing, so it is hardly anomalous to require that they also determine the 'who, what, when, and where' of a prior conviction").

Stone alleges that the district court made five impermissible factual determinations regarding his prior convictions: (1) the date of commission, (2) the date the convictions were entered, (3) his age on the date of commission, (4) the length of the sentences imposed, and (5) whether Stone was still under a criminal-justice sentence when he committed the RICO offenses at issue. But Stone does not cite any authority holding that the district court is prohibited from making these findings. Common sense dictates that these facts are "so basic as to be implicit in the fact of a prior conviction." *See Hollingsworth*, 414 F.3d at 623. The date the offense was committed, the date of entry of the conviction, the duration of the sentence, and whether the sentence had expired before the offense at issue are facts basic to the conviction—the "when[s]." *See Santiago*, 268 F.3d at 156-57. The age of the defendant at the time of the offense goes to the "who" of the prior conviction, and also is a permissible determination for the district court. *Id.* We therefore conclude that the district court did not err in sentencing Stone under criminal history category VI.

### 3.        *Restitution order regarding Stone*

Stone's sentencing arguments implicating *Booker* concerns do not apply to the district court's restitution order. *See United States v. Sosebee*, 419 F.3d 451, 461 (6th Cir. 2005) ("[W]e now conclude that *Booker* does not apply to [orders of] restitution."); *see also id.* ("In addition, five of our sister circuits have recently addressed the issue of whether *Booker* affects restitution orders. Although they rely on different reasoning, all five circuits have uniformly declined to reverse an order of restitution based on the concerns raised in *Blakely* or *Booker*."). The *Sosebee* court reasoned as follows:

First, restitution orders are authorized by statute, 18 U.S.C. §§ 3663, 3663A, and 3664, and in this sense are distinct and separate from the United States Sentencing Guidelines. Although the guidelines mandate imposition of restitution where allowable under the statutes, the restitution statutes function independently from the guidelines and do not rely on the guidelines for their validity. Thus, the *Booker* Court's holding that the Sentencing Guidelines are now merely advisory does not affect orders of restitution. Nor does . . . *Booker*'s analysis of the Sixth Amendment affect restitution, because a restitution order for the amount of loss cannot be said to "exceed the statutory maximum" provided under the penalty statutes. Finally, the Victim and Witness Restitution Act and the Mandatory Victim Restitution Act specifically state that the amount of restitution should be equal to the "amount of each victim's losses *as determined by the court*." 18 U.S.C. 3664(f)(1)(A) (emphasis added). Where, as here, a statute *mandates* that a judge exercise his or her discretion, *Booker* provides no impediments to a judicial determination of the necessary underlying facts.

*Id*. at 462 (emphases in original). We therefore engage in a traditional review of the district court's restitution order instead of reviewing it under *Booker*.

The propriety and the amount of a restitution order are subject to different standards of review. "We review de novo whether a restitution order is permitted under the law. If it is, then the amount of restitution ordered is reviewed under the 'abuse of discretion' standard." *United States v. Wood*, 364 F.3d 704, 714 (6th Cir. 2004) (citation omitted). Because Stone's challenge is limited to the amount of restitution, the district court order is reversible only upon a finding of an abuse of discretion. *Id*.

At sentencing, the district court found by a preponderance of the evidence that Stone was "actively involved" in all four predicate acts and therefore ordered restitution to each of the four victims (three insurance companies and one individual). The amount of restitution imposed was computed by adding together the total amounts of loss for each of the four victims. Stone argues that he was not convicted of all four predicate acts, so that the proper amount of restitution should only take into account the injuries to the victims of the two most minor offenses.

Stone *was* convicted, however, of RICO and RICO-conspiracy offenses. The statute defining the "victims" who are entitled to restitution includes, "in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663(a)(2). In addition, Stone does not dispute that one element of a RICO offense and a RICO conspiracy is a pattern of criminal activity. 18 U.S.C. § 1962(c) (criminalizing the association with an enterprise engaged in interstate commerce that conducts its affairs through a "pattern of racketeering activity"). The district court could therefore award restitution to any victim harmed by the defendant's criminal conduct in the course of the RICO activity.

As the *Sosebee* decision makes clear, the district court was entitled to make factual determinations regarding restitution. *Sosebee*, 419 F.3d at 462. The court made such factual findings here as to all four predicate acts, and Stone has advanced no viable argument as to why the findings constituted an abuse of discretion. We therefore find no error in the district court's restitution order.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the convictions of Johnson and Stone as well as the order requiring Stone to pay restitution, but **VACATE** Stone's sentence and **REMAND** his case for resentencing in accordance with *United States v. Booker*, 125 S.Ct. 738 (2005).