NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0229n.06

No. 18-3996

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| REBECCA WINKLER, as Administrator of the Estate of Sarah R. Rhoads, | ) ) ) | **FILED** Apr 30, 2019 DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| WIN WIN AVIATION, INC.; VINCENT LEMAY; STATE OF OHIO, BUREAU OF WORKERS' COMPENSATION, | ) ) ) | COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| Defendants-Appellees. | ) ) ) | |

Before: SUHRHEINRICH, THAPAR, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. Sarah Rhoads died in a tragic accident while employed by a skydiving business; she was struck by an airplane propeller when trying to speak to the pilot, Vincent Lemay. Her mother, Rebecca Winkler, filed a suit against Lemay and the owner of the plane, Win Win Aviation, Inc., bringing survivorship and wrongful death claims based on their alleged negligence. The district court granted summary judgment in favor of Lemay and Win Win Aviation and dismissed Winkler's claims, on the ground that the defendants owed no duty to Rhoads because her injury was not foreseeable. For the reasons stated below, we AFFIRM.

I.

Start Skydiving has been in the skydiving business since 2007. The company owns three planes. On a typical weekend day, the company operates two planes and takes approximately sixty groups of skydivers for jumps. When its own planes are unavailable, Start Skydiving rents planes

from other companies. Start Skydiving's planes are single-engine planes, but some of the companies from which they rent use twin-engine planes. On the day of the accident, Start Skydiving rented a twin-engine plane from Win Win Aviation, as it had in the past. Lemay (an employee of Win Win) was the pilot. Lemay had piloted twin-engine planes for Start Skydiving three times in the past.

Rhoads had worked for Start Skydiving for a few years prior to the accident. At the time of the accident, her position was Officer Manager/Manifest; she worked indoors—not on the tarmac—and was responsible for billing, assigning skydivers to instructors, and determining flight times. Lemay had completed about ten flights on the day of the accident when he returned to the Start Skydiving tarmac. He parked the plane near a red line, which designated a staff only zone. All Start Skydiving personnel received training before being able to cross the red line and enter the tarmac where the planes parked, and they signed assumption of risk/liability waivers indicating that they understood the dangers of working at Start Skydiving. Lemay left the engine running, which was consistent with company practice: Start Skydiving personnel would refuel with the engines running because shutting down the engines required waiting fifteen to twenty minutes before restarting.

Lemay radioed the manifest office to inquire about lunch plans while he waited for the next load of passengers. Rhoads responded by saying that she planned to get something from Subway and that she would take Lemay's order. Lemay assumed that meant she would take the order over the radio. But Rhoads said that the next load of passengers was delayed, so she would come see Lemay on the tarmac. Rhoads exited the office with pen and paper, ran toward the plane, and crossed over the red line. At first, Lemay thought Rhoads was coming to the side pilot door, but she abruptly changed directions to walk toward the rear passenger door. At this point, Lemay tried

to get her attention by waving at her, but she did not see him.  Rhoads walked directly under the wing and into the propeller, which struck her in the head.  She later died from her injuries.

Winkler, Rhoads's mother, sued Lemay and Win Win Aviation in state court, raising survivorship and wrongful death claims premised on the defendants' alleged negligence.[1] Defendants removed the case to federal court and thereafter moved for summary judgment.  The district court granted summary judgment in favor of defendants, concluding that Winkler's claims failed because she could not show that the injury was foreseeable (a necessary showing for claims based on negligence).  Winkler timely appealed to this court.

## II.

The parties agree that Ohio law governs Winkler's claims.  To recover on a negligence claim under Ohio law, "a plaintiff must prove (1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, and (3) that the breach of the duty proximately caused the plaintiff's injury." *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198, 200 (Ohio 1998).  The sole issue on appeal is whether Lemay and Win Win Aviation owed Rhoads a duty under Ohio law. "The existence of a duty depends on the foreseeability of the injury." *Menifee v. Ohio Welding Prods., Inc.*, 472 N.E.2d 707, 710 (Ohio 1984).  An injury is foreseeable if "a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Id.*  Foreseeability is "not affected by the magnitude, severity, or exact

---

[1] Winkler also filed a claim against the State of Ohio Bureau of Workers' Compensation to resolve a potential priority dispute regarding the State of Ohio's subrogation interests in the event Winkler recovered from defendants.  The State of Ohio cross-claimed, requesting that its subrogation lien for medical benefits and other compensation paid to or on behalf of Rhoads's estate be given priority.  Given that Winkler failed to recover against the defendants, the claims related to the State of Ohio were dismissed.  These claims are not at issue on appeal.

probability of a particular harm." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 29 N.E.3d 921, 929 (Ohio 2015).

Winkler says that Lemay failed in two respects on the day of the accident: (1) he did not give a detailed safety briefing to Start Skydiving personnel when the day started, and (2) he did not shut off the plane engines. Winkler argues that a reasonably prudent pilot would have anticipated that an injury would result from these failures.

The idea that Lemay should have given a safety briefing to Start Skydiving personnel stems from the testimony of Winkler's expert witness, Keith Cianfrani. Drawing on 14 C.F.R. § 91.519, Cianfrani testified that Lemay should have done a safety briefing with all the Start Skydiving personnel before the work day started. According to Cianfrani, if Lemay had given such a briefing, the accident likely would have been avoided. That regulation, however, did not impose upon Lemay a duty to give such a briefing. It requires that pilots ensure that *passengers*, not auxiliary personnel, have been orally briefed on certain topics. 14 C.F.R. § 91.519. And propeller safety is not one of the topics that pilots must discuss with passengers anyway. *Id.* Because § 91.519 did not require Lemay to instruct Rhoads on propeller safety, this regulation could not impose a duty on Lemay.[2]

In fact, Rhoads had received safety training from her own employer, Start Skydiving. According to John Hart, one of Start Skydiving's owners, Rhoads received "pretty extensive" training on, among other things, "prop safety." Rhoads was authorized to cross the red line and enter the tarmac only because she had successfully completed that training. Hart's deposition

---

[2] Winkler puts much emphasis on Lemay's (unsurprising) deposition admission that pilots should follow safety rules in order to protect the crew and passengers and that failure to follow such rules can lead to injuries or death. Given that Winkler has not shown that Lemay failed to follow any safety rule, the testimony is irrelevant.

indicated that "the training would have included . . . all steps necessary to avoid injury by avoid[ing] coming in contact or close proximity to a moving propeller." Consequently, Hart agreed that Rhoads "ha[d] been trained to appreciate the risks and hazards associated with a moving propeller."

For these reasons, Winkler's reliance on *Frazier v. CSX Transportation, Inc.*, 156 F.3d 1229 (6th Cir. 1998) (table), is not persuasive. One of several distinctions between *Frazier* and this case is that the plaintiff in *Frazier* did not know of the danger and was not warned of the danger by the defendant, who both knew and had a duty to warn. *Id.* at *5. Here, given the extensive training, the evidence shows that Rhoads knew of the dangers of a moving propeller. And Lemay had no duty to conduct safety training for Start Skydiving personnel.

We turn next to Lemay's failure to shut off the engines. Here, Winkler aims at the wrong person. Start Skydiving's practices and policies, not Lemay or Win Win Aviation, were responsible for the running engine. Hart testified that it is Start Skydiving's practice to leave the plane engines running in between passenger loads. The planes refuel with the engines running, and on a typical day, "[a]t least one of [the planes] will never shut down." The reason, said Hart, is that a pilot must wait fifteen or twenty minutes to restart the plane after shutdown, and "it's cheaper for them to continue operating than to be down for 20 minutes." So to serve as many passengers as possible on a given day, Start Skydiving leaves the engines running on the tarmac.

Cianfrani testified that not all skydiving companies leave the engines running between jumps and that it is generally safer to shut off the engines. That may be so. But at the same time, a reasonably prudent pilot flying a plane for a company that directs the pilot to leave the engines running between loads would believe that the company has trained its employees regarding the

proper safety procedures around a plane with running engines. And, as discussed previously, that is exactly what Start Skydiving did.

Cianfrani offered two additional reasons to explain why a reasonably prudent pilot would have shut off the engines. First, he points to Rhoads's statement that there was a delay before the next passengers would load. But the delay was short—three to four minutes. Moreover, Cianfrani's assertion that Lemay should have shut down the engines in light of the delay was based on his personal experience that three- to four-minute delays sometimes stretch into thirty. There is no indication in the record that such was the case here. Second, Cianfrani points to the fact that Lemay was flying a twin-engine plane, while Start Skydiving usually uses single-engine planes. But Cianfrani and Hart testified that Start Skydiving used twin-engine planes from time to time. Cianfrani also testified that Rhoads received training on different types of aircraft. As a result, Cianfrani's additional testimony does not affect our analysis.[3]

In sum, the injury was not reasonably foreseeable. Rhoads had worked at Start Skydiving for a few years before the incident, and she received extensive training—including about propeller safety. In fact, Hart could not recall a previous occasion where Rhoads had gone onto the tarmac and crossed the red line. Moreover, Cianfrani testified that a person could see and hear the propeller moving. It was not foreseeable that a Start Skydiving employee would forget her training, cross the red line, fail to see or hear a moving propeller, and walk directly into it. Though this accident was surely tragic, Lemay and Win Win Aviation did not owe a duty to Rhoads, *Menifee*, 472 N.E.2d at 710, for an accident they could not reasonably foresee.

---

[3] Winkler mentions the position in which Lemay parked the plane—nose pointing in a different direction than usual, wing partially over the red line—but makes no argument suggesting how this parking position played a role in the injury. Winkler's failure to elaborate renders any such argument forfeited on appeal. *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006).

\* \* \*

We AFFIRM the judgment of the district court in favor of Lemay and Win Win Aviation.

\* \* \*